In The Matter of the Application for Water Rights of the BOARD OF COUNTY COMMISSIONERS OF the COUNTY OF ARAPAHOE, in Gunnison County.

The BOARD OF COUNTY COMMISSIONERS OF the COUNTY OF ARAPAHOE, Applicant–Appellant/Cross–Appellee,

v.

UNITED STATES of America; Crystal Creek Homeowners Association and Ernest H. Cockrell; Colorado Wildlife Federation, Gunnison Angling Society, High Country Citizens' Alliance, National Wildlife Federation, Rainbow Services, Inc. and Western Colorado Congress; and Upper Gunnison River Water Conservancy District and Board of County Commissioners of Gunnison County, Colorado, Objector–Appellees/Cross–Appellants,

v.

COLORADO RIVER WATER CONSERVATION DISTRICT; Henry J. Berryhill, Jr.; City of Delta; City of Montrose; City of Grand Junction; City of Gunnison; Tri–State Generation and Transmission Association, Inc.; Crested Butte Water and Sanitation District; Perkins D. Sams; East River at Almont Property Owners Association; Gunnison County Electric Association; Murdie Homeowners' Association, Inc.; Mr. and Mrs. Charles Reeder; Virgil and Lee Spann Ranches, Inc.; State Engineer; State Board of Land Commissioners; Three Rivers Resort, Inc.; Uncompahgre Valley Water Users Association; Joseph P. Vader, Raymond P. Van Tuyl, Charles Richard Collard, Thomas E. Collard and Taylor Park Pool Association; and Wapiti Canyon Ranch, Ltd., Objector–Appellees,

and

Keith Kepler, Division Engineer, Water Division 4, Appellee Pursuant to C.A.R. 1(e).

No. 92SA68.

Supreme Court of Colorado, En Banc.

Feb. 21, 1995.

As Modified on Denial of Rehearing April 10, 1995.

Vranesh and Raisch, P.C., John R. Henderson, Paul J. Zilis, Boulder, for applicant-appellant/cross-appellee.

Lois J. Shiffer, Acting Asst. Atty. Gen., U.S. Dept. of Justice, Robert L. Klarquist, Andrew C. Mergen, Appellate Section, Environment & Natural Resources Div., Washington, DC, Michael A. Gheleta, Lynn A. Johnson, U.S. Dept. of Justice, Environment & Natural Resources Div., Denver, for objector-appellee/cross-appellant U.S.

Brownstein Hyatt Farber & Strickland, P.C., Charles B. White, Wayne F. Forman, Denver, for objector-appellees/cross-appellants Crystal Creek Homeowners Ass'n and Ernest H. Cockrell.

David H. Getches, Roger Flynn, Bruce C. Driver, Boulder, for objector-appellees/cross-appellants Colorado Wildlife Federation, Gunnison Angling Soc., High Country Citizens' Alliance, and Western Colorado Congress.

Thomas Lustig, Boulder, for objector-appellee/cross-appellant Nat. Wildlife Federation.

Bruce C. Driver, Boulder, for objector-appellee/cross-appellant Rainbow Service.

Bratton and McClow, L. Richard Bratton, John H. McClow, Gunnison, Williams, Turner & Holmes, P.C., Anthony W. Williams, Grand Junction, for objector-appellee/cross appellant Upper Gunnison River Water Conservancy Dist.

David Baumgarten, Gunnison, for objector-appellee/cross-appellant Bd. of County Com'rs of Gunnison County.

Donald H. Hamburg, Glenwood Springs, for objector-appellee Colorado River Water Conservation Dist.

John F. Kappa, Montrose, for objector-appellees City of Delta and City of Montrose.

Dufford, Waldeck, Milburn & Krohn, Linda E. White, Grand Junction, Grimshaw & Harring, P.C., Wayne B. Schroeder, Denver, for objector-appellee City of Grand Junction.

Collins & Cockrel, P.C., Timothy J. Beaton, Denver, for objector-appellee City of Gunnison.

Moses, Wittemyer, Harrison and Woodruff, P.C., Charles N. Woodruff, Steven P. Jeffers, Mary Jo Menendez, Boulder, Van C. Wilgus, Denver, for objector-appellee Tri-State Generation and Transmission Ass'n, Inc.

Kenneth L. Spann, Almont, for objector-appellee Virgil and Lee Spann Ranches, Inc.

Gale A. Norton, Atty. Gen., Stephen K. ErkenBrack, Chief Deputy Atty. Gen., Timothy M. Tymkovich, Sol. Gen., Patricia S. Bangert, Deputy Atty. Gen., Jennifer L. Gimbel, First Asst. Atty. Gen., Steven O. Sims, Asst. Atty. Gen., Denver, for objector-appellee State Engineer, Appellee Keith Kepler, Div. Engineer, Water Div. 4, and amicus curiae Colorado Conservation Bd.

John E. Kreidler, Montrose, for objector-appellee Uncompahgre Valley Water Users Ass'n.

White & Jankowski, Bruce D. Bernard, Austin C. Hamre, Scotty P. Krob, Denver, for amicus curiae City of Thornton.

Office of Douglas County Atty., J. Mark Hannen, Castle Rock, for amicus curiae The Bd. of County Com'rs of Douglas County.

Maynes, Bradford, Shipps & Sheftel, Frank E. "Sam" Maynes, Thomas H. Shipps, Durango, for amicus curiae Southwestern Water Conservation Dist.

Hobbs, Trout & Raley, P.C., Gregory J. Hobbs, Jr., Bennett W. Raley, Denver, for amicus curiae Northern Colorado Water Conservancy Dist. and its Municipal Subdistrict.

Anderson, Johnson & Gianunzio, Mark T. Pifher, Jonathan C. Dehmlow, Colorado Springs, for amicus curiae City of Colorado Springs.

No appearance on behalf of objector-appellees Henry J. Berryhill, Jr., Crested Butte Water and Sanitation Dist., Perkins D. Sams, East River at Almont Property Owners Ass'n, Gunnison County Elec. Ass'n, Murdie Homeowners' Ass'n, Inc., Mr. and Mrs. Charles Reeder, State Bd. of Land Com'rs, Three Rivers Resort, Inc., Joseph P. Vader, Raymond P. Van Tuyl, Charles Richard Collard, Thomas E. Collard, Taylor Park Pool Ass'n; and Wapiti Canyon Ranch, Ltd.

Justice ERICKSON delivered the Opinion of the Court.

The Board of County Commissioners for Arapahoe County (Arapahoe County) appeals from a judgment of the District Court, Water Division 4 (water court), dismissing Arapahoe County's applications for conditional water rights decrees in the Gunnison Basin. We affirm the water court's dismissal of the application for a conditional water rights decree that Arapahoe County purchased from the National Energy Resources Company (NECO). We reverse the water court's dismissal of Arapahoe County's application for a conditional water rights decree based upon a failure to prove water availability, and re-

mand for further proceedings consistent with this opinion or for a new trial.

The water court's dismissal of Arapahoe County's application for a conditional water rights decree requires us to construe section 37–92–305(9)(b), 15 C.R.S. (1990), the "can and will" statute,[1] and to determine the extent to which existing conditional and absolute decrees should be considered in determining water availability. In requiring Arapahoe County to prove the availability of water to complete the project in the application for a conditional water right, the water court assumed that all major senior conditional rights will become absolute, and that holders of absolute water rights decrees will divert the maximum amount permitted under the decrees. The "can and will" statute requires an applicant for a conditional water rights decree to prove the availability of water under river conditions existing at the time of the application as a threshold requirement to establishing that there is a substantial probability that the project can and will be completed with diligence and within a reasonable time. Accordingly, we reverse and remand for further proceedings consistent with this opinion or for a new trial.

## I

The conditional water rights sought in these cases are for a large water development known as the Union Park Project. The original application was by NECO in 86–CW–226 and asserted a claim for conditional water rights for the Union Park Project. The Union Park Project included construction of the Union Park Reservoir with a capacity of 900,000 acre feet on Lottis Creek, a tributary to the Taylor River. Following a hearing on a motion for summary judgment in 86–CW–226, the water court dismissed most of the application on the grounds that it was a speculative appropriation. § 37–92–103(3)(a), 15 C.R.S. (1990).

Arapahoe County acquired the rights held by NECO to develop the Union Park Project and, on December 30, 1988, filed a separate application in 88–CW–178 to preserve the claims made by NECO in 86–CW–226. On November 30, 1990, Arapahoe County filed amended applications 86–CW–226 and 88–CW–178, which included a plan for augmentation as a contingency in the event the water court found that there was insufficient unappropriated water available to permit diversion of water without injury to existing water rights, and provided for alternate points of diversion.

The Union Park Project would take water from the Upper Gunnison River Basin, located west of the Continental Divide in Gunnison County, then move the water through a tunnel to the Antero Reservoir located east of the Continental Divide in Park County, and would finally transfer the water by a series of tunnels, pipelines, siphons, and flumes to Arapahoe County for ultimate use by its inhabitants and others who contracted with Arapahoe County for the purchase of water.

The proposed sources of water for the Union Park Project are tributaries of the Gunnison River. Within the Gunnison River Basin, the East River and the Taylor River join at the town of Almont in Gunnison County, Colorado to form the Gunnison River. The East River Basin extends over 300 square miles and the Taylor River Basin encompasses approximately 500 square miles. The Gunnison River is a tributary of the Colorado River, which it joins at the City of Grand Junction. Approximately 1.8 million acre feet of water per year flows from the Gunnison River Basin into the Colorado River.

In order to acquire the amount of water allegedly necessary for the Union Park Project, Arapahoe County relies on: six different points of diversion; eleven alternate points of diversion; use of federal reservoir storage facilities; assessment and redetermination of federal water rights; condemnation of existing water rights; change of use of conditional

---

1. Section 37–92–305(9)(b), 15 C.R.S. (1990), states:

No claim for a conditional water right may be recognized or a decree therefor granted except to the extent that it is established that the waters can be and will be diverted, stored, or otherwise captured, possessed, and controlled and will be beneficially used and that the project can and will be completed with diligence and within a reasonable time.

water rights from nonconsumptive to consumptive uses; plans for augmentation; the possible purchase of water rights; and the reevaluation of water rights in the Gunnison River Basin based on the actual legal use of water and present constraints under interstate compacts.[2]

Over a five-year period, the water court considered the objections of a number of water users whose rights are senior and superior to those asserted by Arapahoe County. The water court conducted hearings and entered pretrial orders formulating the issues for trial of Arapahoe County's applications for conditional water rights decrees and the statements in opposition filed by other water users in the Gunnison River Basin.

The water court required Arapahoe County to prove the availability of water in the Gunnison River Basin to complete the Union Park Project. After a number of pretrial hearings, the water court required that computer models be prepared to simulate future river conditions with the assumption that all water that can be diverted in the exercise of decreed senior absolute rights and major conditional water rights be considered unavailable for appropriation.[3]

The water court bifurcated the trial and in phase I heard evidence to determine the availability of water for Arapahoe County's Union Park Project. Phase II of the trial was to determine the feasibility of the Union Park Project and other remaining issues. The water court dismissed Arapahoe County's application for a conditional water rights decree based upon a finding that the water was not available for completion of the Union Park Project. The dismissal of Arapahoe County's application eliminated the need for trial of the issues reserved for phase II. The water court's dismissal of Arapahoe County's application for a conditional water rights decree was based upon an erroneous standard for determining the availability of water.

■ The assumption by the water court that all major senior conditional water rights will become absolute and that holders of absolute water rights will divert to the full extent permitted under their decrees excluded water that is available for appropriation under current conditions on the river. The assumptions for the determination of water availability are contrary to experience and are improbable. A conditional water right may not be perfected and may be terminated for lack of diligence or by abandonment. § 37–92–301, 15 C.R.S. (1990 & 1994 Supp.). Absolute water rights are not in all instances exercised to the full extent or for the full time period permitted in the decree. *See, e.g., Rominiecki v. McIntyre Livestock Corp.,* 633 P.2d 1064, 1067 (Colo.1981) (stating that "diversions are limited to an amount sufficient for the purpose for which the appropriation was made, even though such limitation may be less than the decreed rate of diversion"). To require an applicant to prove the availability of water based on the assumption that all senior conditional rights will be perfected and that all absolute rights will be utilized in their full decreed amounts is to foreclose recognition of applications for conditional water rights decrees that have every

2. Arapahoe County also seeks a determination of the potential effect of the Colorado River Storage Act, 43 U.S.C. §§ 620 to 620(o) (1988 & 1993 Supp.), on new appropriations in Colorado, and the availability of water for appropriation and development under the Colorado River Compact, §§ 37–61–101 to –104, 15 C.R.S. (1990 & 1994 Supp.), and the Upper Colorado River Compact, §§ 37–62–101 to –106, 15 C.R.S. (1990 & 1994 Supp.); *see* David H. Getches, *Competing Demands for the Colorado River,* 56 U.Colo.L.Rev. 413 (1985). To support its claims, Arapahoe County has also relied upon the Colorado River Basin Project Act, 43 U.S.C. §§ 1501 to 1556 (1988 & 1993 Supp.), the Water Supply Act of 1958, 43 U.S.C. § 390b(d) (1988), the Flood Con-

trol Act of 1944, 33 U.S.C. § 701–1 (1988), and the Reclamation Act, 43 U.S.C. § 372 (1988).

3. The water court defined major conditional water right decrees as those involving ten cubic feet per second (cfs) for direct flow and at least 1,000 acre feet for storage rights. *In re Application for Water Rights of the Bd. of County Comm'rs, Arapahoe County,* Nos. 86–CW–226 & 88–CW–178 (Dist. Ct., Water Div. No. 4, Oct. 21, 1991) (Findings of Fact, Conclusions of Law, and Judgment & Decree) (hereinafter Decree) at ¶ 7, p. 8. The water court found the total amount of conditionally decreed rights in the Gunnison River Basin to be 15,625 cfs for direct flow rights and, 1,138,811 acre feet for storage rights. *Id.* at ¶ 89, p. 39.

prospect of resulting in completed appropriations within a reasonable time.

## II

The water court's Findings of Fact, Conclusions of Law, Judgment & Decree was entered on October 21, 1991. The issue in phase I of the trial was the availability of water in the Gunnison River Basin to complete the Union Park Project in accordance with Arapahoe County's two applications and amended applications for conditional water rights decrees. The water court's interpretation of *Southeastern Colorado Water Conservancy District v. City of Florence*, 688 P.2d 715 (Colo.1984), and its application of section 37–92–305(9)(b), the "can and will" statute, require reversal for further proceedings consistent with this opinion or a new trial.

■ To initiate an appropriation of water there must be a co-existence of an intent to appropriate and an open physical act. *Northern Colorado Water Ass'n v. Three Peaks Water, Inc.*, 859 P.2d 836, 839 n. 2 (Colo.1993). An applicant must have an intent to put the water to beneficial use and must demonstrate his intent by an open physical act sufficient to put third parties on notice. *Colorado River Conservation Dist. v. Vidler Tunnel Water Co.*, 197 Colo. 413, 416, 594 P.2d 566, 568. (1979).[4] The right to appropriate water does not include a right to speculate as to the future use and possible sale of the water. *Id.*, at 417, 594 P.2d at 568. We said in *Vidler*:

Our constitution guarantees a right to appropriate, not a right to speculate. The right to appropriate is for *use*, not merely for profit. As we read our constitution and statutes, they give no one the right to preempt the development potential of water for the anticipated future use of *others*

not in privity of contract, or in any agency relationship, with the developer regarding that use. To recognize conditional decrees grounded on no interest beyond a desire to obtain water for sale would—as a practical matter—discourage those who have need and use for the water from developing it. Moreover, such a rule would encourage those with vast monetary resources to monopolize, for personal profit rather than for beneficial use, whatever unappropriated water remains.

*Id.*

To prevent speculation, *Vidler* requires a firm contract or agency relationship with a proposed user who is committed to beneficially use the water. *Id.* at 417–18, 594 P.2d at 568–69. In *Vidler*, decided before the adoption of the "can and will" statute, we stated, "[a] showing of actual, certain availability, or of a good faith belief in the availability, of unappropriated water is not a prerequisite for an award of a *conditional* right to waters from surface streams." *Id.* at 418, 594 P.2d at 569.

■ In December of 1978, four related groups of claimants filed applications for the determination of water rights to divert and use large quantities of tributary and nontributary ground water for speculative purposes. *See State v. Southwestern Colorado Water Conservation Dist.*, 671 P.2d 1294, 1300 (Colo.1983); *Southeastern Colorado Water Conservancy Dist. v. Huston*, 197 Colo. 365, 369 n. 2, 593 P.2d 1347, 1349 n. 2 (1979). In response to the *Huston* case and to concerns regarding speculation in water rights, Senate Bill 481 (S.B. 481) was enacted in 1979. Ch. 346, 1979 Colo.Sess.Laws 1366. The relevant provisions of S.B. 481 are the amendment of the definition of "appropriation"[5] and the addition of the "can and will"

4. For purposes of determining whether an applicant has initiated an appropriation of water, open physical acts encompass "formal acts." *City of Thornton v. City of Fort Collins*, 830 P.2d 915, 926 (Colo.1992). Formal acts include: planning that is focused on the appropriation of water, studies to determine the feasibility of a diversion, expenditures of capital in the planning process, application for water permits, and legal or quasi-legal filings in addition to the applica-

tion for a conditional decree for water rights. *Id.*

5. Ch. 346, sec. 5, § 37–92–103(3)(a), 1979 Colo. Sess.Laws 1366, 1368. The definition provides:

"Appropriation" means the application of a specified portion of the waters of the state to a beneficial use pursuant to the procedures prescribed by law; but no appropriation of water, either absolute or conditional, shall be held to

provision in the statute.[6] By amending the definition of "appropriation" the General Assembly reaffirmed the anti-speculation holding of *Vidler*. *See Jaeger v. Colorado [River] Ground Water Comm'n*, 746 P.2d 515, 522 (Colo.1987) ("The definition of 'appropriation' set forth in the 1969 Act [Water Right Determination and Administration Act of 1969] expressly incorporates the anti-speculation doctrine applied in *Vidler*....").[7]

■■■■ The "can and will" statute imposes limitations on applications for conditional water rights decrees and provides:

> No claim for a conditional water right may be recognized or a decree therefor granted except to the extent that it is established that the waters can be and will be diverted, stored, or otherwise captured,

possessed, and controlled and will be beneficially used and that the project can and will be completed with diligence and within a reasonable time.

§ 37–92–305(9)(b). The General Assembly enacted the "can and will" statute "to reduce speculation associated with conditional decrees and to increase the certainty of the administration of water rights in Colorado." *FWS Land & Cattle Co. v. State, Div. of Wildlife*, 795 P.2d 837, 840 (Colo.1990). The legislative history of the "can and will" statute reflects that the purpose of the statute was to prevent speculation by denying recognition of claims for conditional water rights that have no substantial probability of maturing into completed appropriations.[8]

---

occur when the proposed appropriation is based upon the speculative sale or transfer of the appropriative rights to persons not parties to the proposed appropriation, as evidenced by either of the following:

(I) The purported appropriator of record does not have either a legally vested interest or a reasonable expectation of procuring such interest in the lands or facilities to be served by such appropriation, unless such appropriator is a governmental agency or an agent in fact for the persons proposed to be benefited by such appropriation.

(II) The purported appropriator of record does not have a specific plan and intent to divert, store, or otherwise capture, possess, and control a specific quantity of wat... for specific beneficial uses.

6. Ch. 346, sec. 6, § 37–92–305(9)(b), 1979 Colo. Sess.Laws 1366, 1369.

7. At the opening of the debate on S.B. 481, Senator Anderson, the bill's sponsor, stated that:

A lot of this [S.B. 481] was taken strictly out of court language that we've gone through, especially going back to the one that just came out on the twenty-third of April which was the Vidler Tunnel case, *Colorado Water Conservation District v. Vidler*, and there's some really interesting language in here that, I think, helps us a great deal with the position the court has taken on this particular case in viewing the concern we have as far as [the] Huston filings and this type of thing because they go back and speak to the old *Denver v. Northern Colorado Water District* [130 Colo. 375, 276 P.2d 992 (1954)·] case of some years ago but it's interesting because they use the language [that] our Constitution guarantees a right to appropriate, not a right to speculate. And that's why this language which Felix Sparks felt was impor-

tant, is a part of this Amendment that I'm proposing here.

*Hearing on S.B. 481 Before the Senate*, 52d Gen. Assembly, 1st Reg.Sess. (hearing tape M2T–79 39A, Apr. 25, 1979, at 1:42 p.m.).

Representative Burford, the House sponsor of the bill, opened the House floor debates by emphasizing that the purpose of the bill was to avoid speculation in water rights:

[S.B. 481] is an attempt to reaffirm what legislative intent has been on some of our past major pieces of water legislation. It is a direct reaffirmation of the legislative intent as to those pieces of legislation, it is felt by the sponsor and the Senate and myself that this reclarifying, this particular portion of the law, will help in defeating some of the filings which have taken place throughout the state over the past two or three months. They are generally referred to as the Huston filings, that are now centered in one court in Arapahoe County, Judge Shivers' court. We feel that the reaffirmation of some of the thoughts that went into prior legislation will be helpful in the case and for that reason, I ask you to support Senate Bill 481.

*Hearing on S.B. 481 Before the House*, 52d Gen. Assembly, 1st Reg.Sess. (hearing tape M2T–79 46A, May 10, 1979, at 10:15 a.m.).

8. While testifying before the House Agriculture Committee on May 7, 1979, Ward Fischer, who represented the Cache La Poudre and Thompson Valley Water Users Associations, stated:

The fourth part of [S.B. 481] just really goes to an attempt to make it clear that the Colorado legislature, our Colorado Constitution and our Colorado cases do not encourage pure speculation. We are glad to have people develop water but we are disinclined to let people try to take broad sweeping claims for waters that they cannot use, waters that they cannot capture, waters that they cannot possess and tie

■ The "can and will" statute prevents approval of an application for a conditional water right decree that cannot or will not be completed with diligence within a reasonable time. The statute goes beyond the anti-speculation doctrine of *Vidler* by adding the requirement that an applicant for a conditional water right decree must demonstrate that the water can and will be beneficially used. *See* Mark E. Hamilton, Comment, *The "Can and Will" Doctrine of Colorado Revised Statute Section 37–92–305(9)(b): Changing the Nature of Conditional Water Rights in Colorado,* 65 U.Colo.L.Rev. 947, 953 (1994) (hereinafter Hamilton) (stating that the "can and will" statute "moved beyond mere *prohibition of speculation* and created an entirely new statutory requirement for the acquisition of a conditional right."). The enactment of the "can and will" statute would have been unnecessary if the General Assembly intended to merely codify *Vidler.*

The water court construed *Southeastern Colorado Water Conservancy District v. City of Florence,* 688 P.2d 715 (Colo.1984), as requiring Arapahoe County to assume that all major senior conditional water rights will become absolute and that holders of absolute decrees will divert the amount of water that was decreed in determining water availability. We disagree with the water court's analysis of *Florence.*

In *Florence,* the City of Florence (Florence) sought a conditional water right decree to divert 100 cubic feet per second (cfs) from the over-appropriated Arkansas River. The Southeastern Colorado Water Conservancy District (objector) presented evidence that only 5 to 10 cfs was needed and that construction costs to divert 100 cfs would be $2.5 million, which far exceeded Florence's financial resources. In addition, diversions of 100 cfs would greatly exceed the 4.7 cfs capacity of Florence's intake, pumping, treatment, and storage facilities. *Id.* at 716 n. 1. Evidence was presented that the decree sought

would be in priority during flood conditions for one or two days every twenty-five years. *Id.* at 716 n. 2. Florence successfully argued that conditions on the river might change or that there might be meteorological changes that would increase water availability in the future, and was granted a conditional water right. *Id.* at 718.

We held that the "can and will" statute replaced the *Vidler* standard on proof of availability of unappropriated water and "requires proof that water will be diverted and that the project will be completed with diligence *before* issuance of a decree for a conditional right." *Id.* The applicant in *Florence* failed to sustain its burden of proof that it had complied with the "can and will" statute.

The interpretation of the "can and will" statute in *Florence* is broader than the anti-speculation holding of *Vidler.* *See* Hamilton at 957–58. An applicant must prove that water is available for appropriation under *Florence.* However, *Florence* left unanswered the extent to which existing conditional and absolute water rights decrees should be considered in determining water availability.

In denying a conditional water right decree in *Florence,* we considered lack of economic capability, absence of need, present unavailability of water, and the doubtful feasibility of the project and concluded it was unlikely that the project would be completed with diligence and within a reasonable time.

■ The "can and will" statute should be construed to require an applicant for a conditional water right decree to establish that there is a substantial probability that within a reasonable time the facilities necessary to effect the appropriation can and will be completed with diligence, and that as a result waters will be applied to a beneficial use. Proof of such a substantial probability involves use of current information and necessarily imperfect predictions of future events and conditions.[9]

---

up our water resources in this state to the detriment of our true appropriators.
*Hearing on S.B. 481 Before the House Agriculture Committee,* 52d Gen. Assembly, 1st Reg.Sess. (hearing tape M1T–79 38A, May 7, 1979, at 10:15 a.m.).

9. In *Florence,* we held that an applicant has the burden of proving by a preponderance of the evidence that the "can and will" statute has been satisfied. *Florence,* 688 P.2d at 718, 718 n. 7; *accord In re Gibbs,* 856 P.2d 798, 802–03 (Colo. 1993); *FWS,* 795 P.2d at 840–41; *see Public Serv.*

The long established and legislatively recognized policy of maximum utilization of water provides guidance in construing the "can and will" statute. *See, e.g., Fellhauer v. People,* 167 Colo. 320, 336, 447 P.2d 986, 994 (1968) (noting that it is implicit in the Colorado Constitution that "there shall be *maximum utilization* of the water of this state"); § 37–92–102(1)(a), 15 C.R.S. (1990) ("It is hereby declared to be the policy of the state of Colorado ... to maximize the beneficial use of all of the waters of this state"). The policy of maximum beneficial use is derived from an understanding that the waters of Colorado are a scarce and valuable resource. *State Engineer v. Castle Meadows, Inc.,* 856 P.2d 496, 505 (Colo.1993). The water court's assumption that holders of absolute and major senior conditional water rights decrees will divert and appropriate to the decreed amounts projects water usage that is unrealistically high, and undermines the policy of maximum beneficial use of water.

The "can and will" statute was intended to prevent approval of a conditional water right that cannot or will not be completed with diligence and within a reasonable time. Therefore, to acquire a conditional water right decree, an applicant must establish that there is a substantial probability that within a reasonable time water can and will be appropriated and put to a beneficial use. The applicant must prove, as a threshold requirement, that water is available based upon river conditions existing at the time of the application, in priority, in sufficient quantities and on sufficiently frequent occasions, to enable the applicant to complete the appropriation with diligence and within a reasonable time. When river conditions existing at the time of the application for a conditional water right decree prevent completion of the proposed appropriation, there is no substantial probability that the project will be completed with diligence within a reasonable time. Conditional water rights under which no diversions have been made, or are being made, should not be considered, and absolute water rights should be considered to the extent of historical diversions rather than on the assumption that maximum utilization of the decreed amount is the amount used. Our construction of the "can and will" statute is in accord with our prior case law, with the intent of the General Assembly, and with the policy of maximum beneficial use of water.

## III

### A. NECO's Application

NECO, Arapahoe County's predecessor in interest, obtained a conditional water rights decree, in 82–CW–340,[10] for the storage of 325,000 acre feet of water in the Union Park Reservoir for in-basin, non-consumptive hydro-electric power generation. On December 31, 1986, in 86–CW–226,[11] NECO applied for additional conditional storage rights to enlarge the Union Park Reservoir by 575,000 acre feet to achieve the contemplated storage capacity of 900,000 acre feet. In 86–CW–226, NECO also sought to include additional non-consumptive and consumptive uses for the right it obtained in 82–CW–340. Arapahoe County acquired NECO's interest in the Union Park Project, including its existing water rights, and Arapahoe County was sub-

Co. v. Board of Water Works, 831 P.2d 470, 478 (Colo.1992); City of Thornton. v. City of Fort Collins, 830 P.2d 915, 926 (Colo.1992); Fox v. Division Eng'r, 810 P.2d 644, 646 (Colo.1991). We have applied this requirement in several contexts. See FWS, 795 P.2d at 840 (holding that the applicant failed to satisfy the statute because the applicant did not have an ownership right or access right to the reservoir site); Fox, 810 P.2d at 646 (holding that an augmentation plan necessary to prevent injury to senior appropriators must be in place before a conditional water right decree can be granted under the "can and will" statute); see also City of Thornton, 830 P.2d at 932. Because future events and conditions cannot be established as fact, however, we have denominated considerations such as economic

feasibility, which are to some extent dependent on future developments not within the applicant's control, as "factors" in determining whether the "can and will" statute has been satisfied, rather than as elements of the applicant's proof. Public Serv. Co., 831 P.2d at 478–79. Nevertheless, the failure of an applicant to present evidence concerning such factors can be considered by the water court in determining whether the "can and will" statute has been met. Id. at 479.

10. Water Division No. 4, Case No. 82–CW–340.

11. Water Division No. 4, Case No. 86–CW–226.

stituted as the applicant to change the use of NECO's conditional storage decree and application for additional conditional water rights.

On December 29, 1988, as a result of a motion for summary judgment, the water court dismissed most of the application in 86–CW–226. The water court ruled that because NECO did not have firm contracts for use of the water at the time the application was filed, the application for consumptive use of 900,000 acre feet of water per year was speculative.[12]

### B. Arapahoe County's Application

On December 30, 1988, Arapahoe County filed a separate application for a conditional water right decree to store up to 900,000 acre feet of water per annum.[13] Numerous issues of law were presented to the water court under C.R.C.P. 56(h).[14] As a result of these pretrial motions, many of which pertained to implementation of the "can and will" statute, the water court entered pretrial orders establishing the framework within which evidence was to be presented. Included in this framework was the requirement that the parties model water availability to simulate river system conditions at the time of the application and assume that all water that can be diverted in the exercise of decreed senior absolute rights and major conditional water rights be considered unavailable for appropriation.

The trial extended over twenty-two days of evidentiary hearings. The water court took the case under advisement and entered its Findings of Fact, Conclusions of Law, Judg-

ment & Decree on October 21, 1991. The court found that a maximum of 20,000 acre feet of unappropriated water is legally available for appropriation on an annual basis at the points of diversion claimed by Arapahoe County. The court also found that Arapahoe County had failed to satisfy its burden of proof and had not established that any additional unappropriated water is available. Arapahoe County claimed that expert testimony and the models presented established that between 125,000 and 139,500 acre feet of water was available on an annual basis.

Arapahoe County advised the water court that 20,000 acre feet of water was insufficient to justify proceeding to trial on phase II to determine the feasibility of the project. Accordingly, the water court dismissed Arapahoe County's application on December 30, 1991, and issued its findings, conclusions, and orders as the final orders of the court. Arapahoe County appealed.

### IV

Arapahoe County asserts that the water court erred in ruling that the application for a conditional water rights decree Arapahoe County purchased from NECO was speculative because NECO should have been allowed to offer evidence of its ongoing efforts to obtain commitments for the water sought in its application for a conditional decree up to and including the date of trial. The water court held that NECO had to establish that it had the requisite intent to appropriate water at the time it filed its application. We agree with the water court. An applicant must

---

**12.** The water court allowed that portion of the application that sought to add non-consumptive uses for the existing conditional decree to stand.

**13.** In Water Division No. 4, Case No. 88–CW–178, Arapahoe County amended its application in response to several pretrial orders. These amendments are not relevant to the issues raised on appeal.

**14.** C.R.C.P. 56(h) states:

 **Determination of a Question of Law.** At any time after the last required pleading, with or without supporting affidavits, a party may move for determination of a question of law. If there is no genuine issue of any material fact necessary for the determination of the question

of law, the court may enter an order deciding the question.

The purpose of Rule 56(h) is,

 to allow the court to address issues of law which are not dispositive of a claim (thus warranting summary judgment) but which nonetheless will have a significant impact upon the manner in which the litigation proceeds. [Resolving such issues] will enhance the ability of the parties to prepare for and realistically evaluate their cases ... and allow the parties and the court to eliminate significant uncertainties on the basis of briefs and argument, and to do so at a time when the determination is thought to be desirable by the parties.

5 Robert Hardaway & Sheila Hyatt, *Colorado Civil Rules Annotated* § 56.9 (1985).

identify the property, the committed ultimate users, and the specifics of its plan to appropriate water. The water court properly required NECO to demonstrate its intent to appropriate at the time the application was made.

## A

The filing of an application in the water court to obtain a conditional water right is a claim that is analogous to a civil complaint. § 37–92–302(1), 15 C.R.S. (1990); *see also* William A. Hillhouse & Barbara T. Andrews, *Management of the Complex Water Case,* 31 Rocky Mtn.Min.L.Inst. 24–1, 24–12 (1985).

Section 37–92–305(1), 15 C.R.S. (1990), provides:

> In the determination of a water right the priority date awarded shall be that date on which the appropriation was initiated if the appropriation was completed with reasonable diligence. If the appropriation was not completed with reasonable diligence following the initiation thereof, then the priority date thereof shall be that date from which the appropriation was completed with reasonable diligence.

Because the date an applicant initiated appropriation can establish priority, an applicant is required to set forth the date it contends it initiated the appropriation of water. § 37–92–302(2)(a), 15 C.R.S. (1994 Supp.) ("In the case of applications for a determination of a water right or a conditional water right, the forms shall require, among other things, a legal description of the diversion or proposed diversion, a description of the source of the water, the date of the initiation of the appropriation or proposed appropriation, the amount of water claimed, and the use or proposed use of the water.").

For simplicity in administering water rights, the General Assembly has created a system whereby priority is initially determined based on the year the application for the water right is filed:

> [T]he priority date awarded for water rights or conditional water rights adjudged and decreed on applications for a determination of the amount and priority thereof filed in such division during each calendar year shall establish the relative priority among other water rights or conditional water rights awarded on such applications filed in that calendar year; but such water rights or conditional water rights shall be junior to all water rights or conditional water rights awarded on such applications filed in any previous calendar year and shall also be junior to all priorities awarded in decrees entered prior to June 7, 1969, or decrees entered in proceedings which were pending on such date....

§ 37–92–306, 15 C.R.S. (1990). Thus, two dates are critical in determining priority: the date the application was filed, which sets the calendar year the water right was filed and establishes priority in relation to filings in other calendar years; and the date appropriation was initiated, which establishes priority among rights applied for in the same calendar year.

In its application to increase the storage capacity of the Union Park Project to 900,000 acre feet, NECO asserted:

> A. Date of initiation of appropriation: September 30, 1982 (Lottis Creek); October 15, 1982 (Taylor River); December 14, 1982 (Willow Creek) (all as decreed in 82CW340); and October 15, 1982 (Union–Antero Conduit).

> B. How appropriation was initiated: The Union Park Project is an integrated hydroelectric and water project which was begun in 1982 and was partially decreed in 82CW340, and has continued with the application in 85CW96. The project has been initiated by proper field work, including staking and surveying of the location of the facilities by the agents of the applicant, which work has been ongoing and is presently continuing, and by corporate resolution.[15]

---

15. In a prior case, 82–CW–340, NECO obtained a conditional decree for the storage of 325,000 acre feet in the Union Park Reservoir for hydroelectric purposes which was reduced by 4,500 acre feet in 85–CW–96. Thereafter, NECO's application was supplemented by Arapahoe County's application in 88–CW–178 on December 30, 1988. Subsequently, the applications in 86–CW–226 and 88–CW–178 were amended by Arapahoe

If NECO could sustain its burden of proving that it had initiated appropriation in 1982, and completed the appropriation with reasonable diligence, NECO would have had priority over claims filed after 1986. As to claims filed in 1986, NECO would, on the basis of the relation-back doctrine, have had priority over claims filed after its 1982 initiation dates.

## B

The water court required NECO to demonstrate that it had the requisite intent to appropriate water when its application was filed. NECO claims that it initiated appropriation in 1982 and is entitled to priority based on the date of appropriation. NECO could not support its claim that it initiated appropriation in 1982 by pointing to events that occurred years later. In asserting that it can rely on subsequent acts to prove its initial appropriation, NECO ignored the requirements of section 37–92–302(1) and the steps necessary to obtain a conditional rights decree. Acts that occurred after 1982 are not relevant to the determination of whether NECO met the requirements to obtain a conditional water rights decree at the date alleged in the pleadings.[16] Although an applicant is required to plead that it initiated appropriation on a specific date and must prove that it complied with the requirements to obtain a conditional decree as of that date, a water court can hear evidence that supports the applicant's initiation of appropriation that precedes the date the application for a conditional water right is filed.

The doctrine of maximum beneficial use of water requires courts to interpret applications for water rights to encourage development of Colorado's water resources. *See Metropolitan Suburban Water Ass'n v. Colorado River Water Conservation Dist.,*

148 Colo. 173, 194, 365 P.2d 273, 285 (1961) (stating that the relation-back principle should be construed and applied in a manner which would "aid and encourage, rather than to block development and early use of the water resources of the state."). Accordingly, it is within a water court's discretion to hear evidence that would establish whether the appropriation was initiated later than the appropriation date but prior to the application for a conditional decree.

If sufficient evidence of the initiation of appropriation prior to the filing of the application is produced, the trial court may conform the pleadings to the evidence and fix the date when appropriation was initiated as the relevant date for priority purposes. The water court permitted Arapahoe County to present evidence of its intent to appropriate water that existed prior to the date of the application for a conditional water rights decree. NECO offered evidence to prove that it entered into a contract with Parker Water and Sanitation District in Douglas County, Colorado, to sell 1,000 acre feet of water and an option to purchase an additional 2,000 acre feet prior to the application date. The contract stated:

> Whereas, NECO has at present no other contracts with municipal or quasi-municipal end users of its water, and such contracts committing such purchasers to purchase some Project water are essential to avoid possible dismissal of the Application under Colorado case law . . . .[17]

In an order entered on October 29, 1988, dismissing with prejudice most of NECO's application in 86–CW–226, the water court held:

> NECO's application [86–CW–226] filed December 29, 1986, claimed *new* water (i.e., 575,000 acre feet over and above the

County on November 30, 1990, with the inclusion of a plan for augmentation.

16. If an application is contested, either by a private party or by the state engineer, the applicant may amend the application and set forth a new date for initiating the appropriation. The water court could then make the appropriate determination based on the amended application. In this case, however, NECO did not amend its application.

17. NECO contracted for the sale of water to establish that it was not speculating in water rights. A contract with the Parker Water and Sanitation District provided for the purchase of 1,000 acre feet of water at $4,000 per acre foot. If Arapahoe County perfected the conditional water rights it was seeking, it would have water rights that it valued at 3.6 billion dollars.

325,000 acre feet it was conditionally awarded in 82–CW–340 in this Court), and it failed to properly identify committed ultimate users, except for Parker Water and Sanitation District in Douglas County, Colorado, which was committed to purchase 1,000 acre feet out of the 900,000 acre feet claimed by NECO. This contract alone is totally inadequate to meet the requisites of the anti-speculation statute.

■ NECO's application in 86–CW–226 sought priority for 900,000 acre feet of water. At the date of filing, NECO had only contracted for the sale and use of 1,000 acre feet of water. NECO based its application on unsupported claims and then attempted to support the claims by obtaining contracts subsequent to the filing. The water court correctly required NECO to substantiate its assertions and refused to grant a conditional water rights decree because the application was based on future contingencies.[18]

The record does not support a conclusion that NECO formed the requisite intent prior to filing its application. The application was speculative when filed and the water court properly granted summary judgment, in 86–CW–226, dismissing the application Arapahoe County purchased from NECO.

V

Arapahoe County claims that water was available for the Union Park Project based on the current water usage in the Gunnison River Basin. At pretrial hearings and at trial, the water court rejected Arapahoe County's assertions and a number of theories to support its application. In its pretrial orders the water court provided the basis for determining whether a conditional water rights decree would be granted for the Union Park Project. The decree outlines the procedures followed by the water court in determining the availability of water:

14. As a result of the pre-trial motions . . ., the Court entered a number of orders which established a framework within which evidence was to be presented regarding the modelling of water availability and regarding the extent to which the Applicant would have to demonstrate compliance with permitting requirements as prerequisites to the issuance of the conditional decrees sought.

15. Because of the complexity of the issues and the lack of precedent, the Court, on the basis of certain motions for reconsideration, modified and refined some of said Orders, so that the most recent amendments to said Orders, together with the Court's Case Management and Pretrial Orders, became the law of the case. Because of the sheer volume of data and materials bearing on the many issues in these cases, the issues were bifurcated for trial. As a result, the threshold issue of "water availability" was tried first. This Decree addresses that issue and some

---

18. In its October 29, 1988, order, the water court ruled: "It is clear that NECO did not have its plan subscribed by committed ultimate users. At most it had a sale of 1,000 acre feet, representing about one-tenth of one per cent of the water it seeks to appropriate. This amount is de minimis and in the total scheme of the plan does not justify recognizing the application even to this limited extent."

The objectors to Arapahoe County's application contend that an applicant must prove that it has firm commitments for *all* of the water sought in the application to avoid dismissal and that the water court erred in not applying this principle. We agree with the water court.

In *Vidler*, we held that the applicant had presented sufficient evidence of intent to appropriate water for a portion of the claimed water to be used on its land, but had failed to produce sufficient evidence of intent to provide water to municipalities. *Vidler*, 197 Colo. at 418, 594 P.2d at 569. We allowed the conditional decree to stand for that portion of the water for which the applicant had established the requisite intent and contractual commitments. An applicant must have firm commitments for the full amount of a proposed appropriation in order to receive a conditional water right decree to the full extent of the proposed appropriation. *See Vidler*, 197 Colo. at 418, 594 P.2d at 569.

NECO's failure to obtain firm commitments to use all of the water prior to application for a conditional water right is not determinative of whether a conditional water right should be issued. Instead, the water court correctly analyzed the possibility that a showing of some commitment from users of water could result in a decree for a portion of the amount of water for which Arapahoe County sought a conditional water right. However, a decree for 1,000 acre feet of water was not a viable option. Accordingly, the water court properly dismissed the application.

closely related "permitting" issues regarding the Applicant's legal eligibility to obtain three federal approvals which concern water availability (i.e. the impact of the need for special use permits from the United States Forest Service and the Bureau of Reclamation, and the impact of the Endangered Species Act).

16. Some of the significant holdings by the Court in its pretrial orders which were to guide counsel in their preparation for trial included the following:

a. "[T]he operative facts of the case must be determined as of April 15, 1991, or earlier." (1/8/91 Order)

b. The Applicant may not establish water availability by relying on the prospect of *purchasing* water or water rights owned by senior appropriators in order to eliminate the call of those rights. (9/14/90 Order, p. 12)

c. "Federal approval will be required before the Applicant can utilize Taylor Park Reservoir as a forebay to serve the Applicant's pumping facilities." (9/14/90 Order, p. 14)

d. The Applicant cannot premise water availability on an assumption that it can obtain federal approval to maintain Taylor Park Reservoir at a full or nearly full level or to install pumping plants in the reservoir. (9/14/90 Order, p. 15)

e. The Bureau of Reclamation cannot dispose of water in the Aspinall Unit except through a written contract. A subordination of water rights is tantamount to a disposition and therefore a formal written contract for subordination is necessary before the Applicant can premise water availability on subordination. (9/14/90 Order, p. 18) In connection with this principle, the Court also ruled on 4/4/91 that to the extent Arapahoe was relying on the Aspinall Unit for augmentation water, the plan could not be successfully pursued unless Arapahoe established its right to use Aspinall Unit water by written contract.

f. In analyzing water availability, the Court directed that the parties were to consider existing water rights, both absolute and major conditional decrees (which upon being made absolute would materially impact the Gunnison River Basin). Major conditional decrees were defined as those involving at least 10 c.f.s. for direct flow or at least 1,000 acre feet for storage rights. While the Court indicated that it expected the existing rights to be quantified based upon reasonable application and use of their decreed amounts, the Court also recognized that the parties had divergent views in modelling existing rights. Because this was a matter of first impression for this court, it also authorized each party to present its theory of quantifying existing water rights with the understanding that the Court would base its decision on water availability on the approach which seemed to be most reasonable after the evidence was presented.

g. After entering at least two conflicting orders on how the hydropower generation rights of the Aspinall Unit should be modelled, the Court indicated that it would reconsider the issue, and enter its final ruling as a part of this Decree.

h. During the course of the pretrial proceedings in these two cases, the Court also made rulings in certain other cases which impact to some extent the issues herein. Briefly those cases are:

1) The Court's 9/18/90 Decrees in cases 86–CW–202 and 86–CW–203 which awarded to the Upper Gunnison River Water Conservancy District a decree to refill the Taylor Park Reservoir to the extent of 106,203 acre feet with an appropriation date of August 28, 1975. (This case is now on appeal, but the Court held in its 4/11/91 Order that the decree in 86–CW–203 is "entitled to full recognition and enforcement unless reserved or modified by the Colorado Supreme Court.")

2) The Court's March 25, 1991, Decrees in 90–CW–92 and 90–CW–110 upholding the validity of certain *private* minimum instream flow decrees issued in 1975 in cases: W–1985, W–1986 and W–1991 (addressed in the order in 90–

CW–92) and W–1987 (addressed in the order in 90–CW–110).

3) The Court's Decree issued in May 1991 in 88–CW–183 wherein it found reasonable diligence with respect to certain conditional decrees for the Upper Gunnison River Project (owned by the Colorado River Water Conservation District), but significantly, the Court canceled certain conditional decrees in said project, including decrees for the East River Canal and the Taylor River Canal.

Decree at ¶¶ 14–16, pp. 7–9.

In response to the numerous pretrial rulings, Arapahoe County and two objectors, the Crystal Creek Homeowners Association and the Colorado River Water Conservation District, produced computer models to simulate river conditions and to determine water availability. The models offered by Arapahoe County, and by those opposing the granting of the conditional right, produced widely disparate conclusions regarding water availability as a result of the differing assumptions used in preparing the computer models. The water court approved a method of modelling which assumed that holders of all major senior conditional and absolute water rights decrees would divert water to the maximum amount permitted under their decrees.[19]

■ The water court gave detailed directions for modelling water availability:[20]

17. **Premises for Analysis of Existing Rights:** As part of the law of the case, the Court informed counsel that it defined existing water rights as including all absolute decrees and "major conditional water rights" which had priority over the Applicant's proposed project. (See the Court's pretrial orders of April 4 and May 6, 1991, regarding existing water rights.) The Court recognized that in some ways a *basin-wide analysis* of water availability was a matter of first impression without statutory or case law to provide well-defined guidelines. Thus, the Court indicated a willingness to let each party present its theory of the case regarding water availability, "... so long as the theory reflects the 'present condition of the river' and *not* some *future* condition of the river." [Paragraph 4(g) of Order of 5/6/91 on Existing Rights.] However, while permitting some flexibility of approach, the Court also indicated that in the absence of persuasive evidence to the contrary it expected the parties to model water availability on the basis of the following principles:

a. The model was to reflect the impact of existing water rights senior to the priority dates claimed by Arapahoe.

b. The Court utilized April 15, 1991, as the date to determine the quantity of a given right.

c. As a general rule, the Court expected the parties to model existing senior rights on the basis of the face amount of the decrees for said rights, while taking into account the decreed purpose of the right—i.e. taking into account for example, that a direct flow irrigation right is not diverted continuously 365 days per year, but rather is

19. When determining water availability, the Colorado Water Conservation Board:
consider actual physical and legal availability of water rather than unappropriated water.... When considering legal water availability the Board does not consider the existence of conditional water rights because many basins are over-appropriated with conditional water rights and the Board cannot predict which rights will eventually be developed. In the event a senior conditional water right is developed, the seniority of that right is respected in the administration of the ISF decree [decree granted to the Colorado Instream Flow and Natural Lake Level Program].
Department of Natural Resources, Colorado Water Conservation Board, *Statement of Basis and Purpose and Rules and Regulations Concerning*

*the Colorado Instream Flow and Natural Lake Level Program* § 5 at 4 (Proposed Rule, Sept. 10, 1993).

20. The method of proving water availability adopted by the water court is burdensome and the results are highly unreliable. Using elaborate computer models to predict future river conditions, based on assumptions concerning the future operation of existing and proposed water projects, compounds the burden on the applicant and the likelihood of error. We cannot assume that the General Assembly intended that an applicant for a conditional decree for water rights engage in a complex, burdensome, and unreliable process for determining water availability and compliance with the "can and will" statute.

utilized only during the irrigation season (commonly from April through October), and that it is diverted only as needed to maintain a given crop. To permit reliable analysis in this regard, the Court authorized the parties to utilize historic data as a guide to the actual use of a given right. Further, the Court established the following guidelines:

1) In quantifying an *absolute* right, the Court recognized that the original decreed amount of an absolute right could be altered by a formal abandonment proceeding or by being re-quantified through a change proceeding or by modification by the Division Engineer pursuant to § 37–92–502(2). Thus, the April 15, 1991, date fixed the time after which such alterations could not be considered.

2) In quantifying a *conditional* right, the Court indicated that the parties could properly consider said right's "contemplated draft on the stream." And in this regard the Court indicated that accepted rules of thumb should be employed with respect to water usage based upon the amount of water decreed, but that in the absence of accepted formulas, the Court would consider expert opinion regarding the "quantity which is reasonable to satisfy the amount claimed for the decreed purpose." (p. 3 of Order of 5/6/91 on Existing Rights.) However, in adopting this concept, the Court did *not* anticipate reevaluating the conditional right and reducing its decreed quantity based upon a belief that future demand for water would be less than reasonably estimated when the decree was granted.

. . . .

159. In fact, the Upper Basin has not been intensively administered by the Division Engineer in the past, in part because of cooperative efforts by neighboring ranchers, and also based on agreements (such as the 1975 Exchange Agreement regarding releases from Taylor Park Reservoir), which sought to maximize the beneficial use of scarce water resources. Further, records of historic diversions reflect only the water being diverted under *absolute* decrees, and modelling based on said records alone fails to reflect the impact of existing conditional rights which are being diligently developed to utilize additional water.

Decree at ¶¶ 17, 159, pp. 9–10, 61.

### A

The water court ruled that in calculating the amount of water available, absolute water rights must be considered based on the face amount of the decree and the decreed purpose. We disagree.

 To provide protection to the rights of other appropriators, limitations are read into every decree for a water right. *Orr v. Arapahoe Water and Sanitation Dist.,* 753 P.2d 1217, 1223 (Colo.1988). One limitation is that "diversions are limited to an amount sufficient for the purpose for which the appropriation was made, even though such limitation may be less than the decreed rate of diversion." *Rominiecki v. McIntyre Livestock Corp.,* 633 P.2d 1064, 1067 (Colo. 1981). The holder of a water right decree cannot divert more water than can be used beneficially. *Weibert v. Rothe Bros., Inc.,* 200 Colo. 310, 316, 618 P.2d 1367, 1371 (1980).

 Absolute water right decrees should be considered to the extent of historical diversions, not to the maximum amount for the decreed purpose. Applicants should not be required to assume, contrary to historical practice, that every absolute decree for water rights will be exercised to divert the amount of water decreed. An applicant for a conditional water right decree may prove that water is available by demonstrating that historically water has been available at the time water is needed.[21]

---

21. River conditions vary from year to year based on such factors as the time and amount of precipitation, runoff, and the appropriation of water. Historical records maintained by the state engineer, may, when relevant to a particular point of diversion or the use of water, provide evidence of the availability of water under the "can and will" statute. An applicant would not

## B

In quantifying the conditional right, the water court assumed that water would be diverted to the extent of the decreed purpose. The water court "did *not* anticipate reevaluating the conditional right and reducing its decreed quantity based upon a belief that future demand for water would be less than reasonably estimated when the decree was granted." Decree at ¶ 17, p. 10. The water court's analysis assumes that all major senior conditional decrees for water rights will be perfected, and that water will be diverted when no water is being diverted.[22]

We disagree with the water court's analysis. A conditional water right is, "a right to perfect a water right with a certain priority upon the completion with reasonable diligence of the appropriation upon which such water right is to be based." § 37–92–103(6), 15 C.R.S. (1990). Appropriation is defined as, "the application of a specified portion of the waters of the state to a beneficial use pursuant to the procedures prescribed by law...." § 37–92–103(3)(a).

In *Qualls, Inc. v. Berryman*, 789 P.2d 1095, 1098 (Colo.1990), we said, " 'A conditional water right is adjudicated by a judicial decree recognizing the existence of an uncompleted application.' ... Thus the holder of a conditional water right holds a vested right to obtain an absolute water right subject to completion of the appropriation with reasonable diligence." (citations omitted).

The special concurrence in *Qualls* stated:

Although a conditional water right has been termed vested, it is vested in the sense that if the appropriator diligently puts the water to beneficial use, the appropriator is entitled to a water right to the extent, and in the amount, actually put to beneficial use with a priority date of the original conditional decree.

*Id.* at 1103 (Erickson, J. specially concurring) (citations omitted).

A conditional water right decree does not reflect actual water usage. The extent to which a conditional decree will be perfected cannot be predicted with certainty and depends upon the completion of the requirements necessary to appropriate and put the water to a beneficial use. *See, e.g., Upper Gunnison River Water Conservancy Dist. v. Board of County Comm'rs of Arapahoe*, 841 P.2d 1061, 1064–65 (Colo.1992) (discussing the statutory requirement that owners or users of conditional water rights must file applications for a determination of reasonable diligence to maintain their conditional rights); *Southeastern Colorado Water Conservancy Dist. v. Twin Lakes Assocs., Inc.*, 770 P.2d 1231, 1237–38 (Colo.1989) (discussing abandonment of water rights in general); *Talco, Ltd. v. Danielson*, 769 P.2d 468, 472 (Colo.1989) (noting that in order to obtain a finding of diligence an applicant must prove "an intention to use the water, coupled with concrete action amounting to diligent efforts to finalize the intended appropriation.") (quoting *Orchard Mesa Irrigation Dist. v. City & County of Denver*, 182 Colo. 59, 65, 511 P.2d 25, 28 (1973)).

The water court's interpretation of the "can and will" statute prohibits future appropriations based on unrealistically high assumptions of water utilization by holders of absolute and senior conditional water rights decrees. Applicants for new conditional water rights decrees are prevented from beneficially appropriating unused waters, and the policy of maximum beneficial use is undermined by the water court's analysis of the "can and will" statute.

Although a conditional water rights decree may affect the calculation of the availability of water when the rights are exercised, it is

ordinarily be required to demonstrate with elaborate computer models that water is available. Computer models should not be necessary when the applicant is seeking a decree for a small amount of water. In this case, the claim extended basin-wide to establish water availability and was for a storage right of up to 900,000 acre feet of water per year.

22. A decreed conditional water right can be perfected into an absolute right to the extent that water is captured by diversion or storage within a reasonable time. David C. Hallford, *Developments in Conditional Water Rights Law*, 14 Colo. Lawyer 353, 359–60 (1985). Perfection eliminates the need to show future diligence for the portion of the right that is made absolute. *Id.* at 360.

difficult to predict whether, and to what extent, the appropriation will be completed. Rather than speculate about the extent to which conditional rights will be exercised, and without the assumption that conditional rights will be exercised to the decreed amount, river conditions existing at the time of the application for a conditional water rights decree should be considered to determine water availability. Present conditions provide a more accurate representation of what water is being beneficially used and what water is available for appropriation. Conditional water rights under which diversions have not been made or none are being made should not be considered in determining water availability.

## VI

 A cross appeal was filed by a local homeowners association (cross-appellant) and local, state, and national environmental groups. The cross-appellants contend that the water court erred in not considering the alleged impact the Union Park Project would have on the natural and man-made environment in the Gunnison River Basin. Specifically, the cross-appellants maintain that the Union Park Project would adversely affect fisheries and wildlife habitat, recreation, water quality, the basin's economy including the tax base, property values and land use, and the general quality of life—factors they deem "vitally important to the public." The limited inquiry required to determine whether to issue a conditional water rights decree in this case does not include evaluation of environmental factors.

 The water court has exclusive jurisdiction over an application for a conditional water right decree. *In re Application of Bubb v. Christensen*, 200 Colo. 21, 25, 610 P.2d 1343, 1346 (1980). The relevant inquiry in determining whether to grant an application for a conditional water right decree is whether the applicant has completed a valid first step toward appropriation. The applicant, as a first step, must establish there is an intent to appropriate water for beneficial use and overt acts put others on notice that a specified water right is being claimed. *See, e.g., Northern Colorado Water Ass'n v. Three Peaks Water, Inc.*, 859 P.2d 836, 839 n. 2 (Colo.1993); *City of Thornton v. City of Fort Collins*, 830 P.2d 915, 924–25 (Colo.1992).

The cross-appellants contend that the first prong of this inquiry requires evaluation of environmental factors because an applicant must prove "beneficial use." The cross-appellants assert that this phrase inherently encompasses a broad public policy of protecting the natural and man-made environment. We disagree.

The General Assembly has defined "beneficial use":

> "Beneficial use" is the use of that amount of water that is reasonable and appropriate under reasonably efficient practices to accomplish without waste the purpose for which the appropriation is lawfully made and, without limiting the generality of the foregoing, includes the impoundment of water for recreational purposes, including fishery and wildlife. For the benefit and enjoyment of present and future generations, "beneficial use" shall also include the appropriation by the state of Colorado in the manner prescribed by law of such minimum flows between specific points or levels for and on natural streams and lakes as are required to preserve the natural environment to a reasonable degree.

§ 37–92–103(4), 15 C.R.S. (1990). In enacting this definition, the General Assembly referenced the mechanism it established to address protection of the environment—instream flow legislation.

In enacting instream flow legislation, the General Assembly granted the Colorado Water Conservation Board "exclusive authority" to appropriate minimum stream flows in natural streams and minimum levels for natural lakes. This legislation recognizes the need to protect the environment. *See* § 37–92–102(3), 15 C.R.S. (1990) (stating that the Colorado Water Conservation Board has authority "to correlate the activities of mankind with some reasonable preservation of the natural environment"). Thus, the General Assembly has established a statutory mechanism whereby the state can protect the interests that concern the cross-appellants.

In addition, the General Assembly adopted the Colorado Water Quality Control Act in 1981, section 25–8–102(1), 11A C.R.S. (1989), which states:

> [I]t is declared to be the policy of this state to prevent injury to beneficial uses made of state waters, to maximize the beneficial uses of water, and to develop waters to which Colorado and its citizens are entitled and, within this context, to achieve the maximum practical degree of water quality in the waters of the state consistent with the welfare of the state.

The Act further provides that:

> No provision of this article shall be interpreted so as to supersede, abrogate, or impair rights to divert water and apply water to beneficial uses in accordance with the provision of sections 5 and 6 of article XVI of the constitution of the state of Colorado....

§ 25–8–104(1), 11A C.R.S. (1989). The Water Quality Control Act establishes that the General Assembly considered the need to protect the quality of the water of the state, but the legislation did not reach the degree of protection sought by the cross-appellants.

Although environmental factors might provide a reasonable and sound basis for altering existing law, we have previously held: "If a change in long established judicial precedent is desirable, it is a legislative and not a judicial function to make any needed change." *People v. Emmert,* 198 Colo. 137, 141, 597 P.2d 1025, 1027 (1979) (quoting *Smith v. People,* 120 Colo. 39, 51, 206 P.2d 826, 832 (1949)).

In *Southeastern Colorado Water Conservancy District v. Shelton Farms, Inc.,* 187 Colo. 181, 529 P.2d 1321 (1974), the holders of water rights attempted to augment their water rights by eliminating phreatophytes— water consuming plants.[23] The applicants asserted that they had salvaged water by eliminating phreatophytes and that the right to this salvaged water was not subject to the call of prior appropriators. We recognized that it was worthwhile to develop this source of water, but declared that "to create such a

scheme is the work of the legislature...." *Id.* at 192, 529 P.2d at 1327.

Similarly, in *R.J.A., Inc. v. Water Users Ass'n,* 690 P.2d 823 (Colo.1984), an applicant proposed to remove peat bogs in order to reclaim water in the bogs. We held:

> Whether to recognize such rights, and thus to encourage innovative ways of reducing historical consumptive uses by modifying conditions found in nature, is a question fraught with important public policy considerations. As such, the question is especially suited for resolution through the legislative process.

*Id.* at 828. We rejected *R.J.A.*'s invitation to establish a new state policy regarding preservation of the environment and said:

> The General Assembly has addressed the accommodation of the policy of maximum utilization of water and the policy of preservation of natural resources, but only in a limited way. It has expressed its concern that maximum utilization of water be balanced by preservation of the natural environment "to a reasonable degree" by authorizing appropriations on behalf of the people of the state of Colorado for that latter purpose. §§ 37–92–102(3) and 103(4), 15 C.R.S. (1973)....

*Id.*

We have consistently recognized that the General Assembly has acted to preserve the natural environment by giving authority to the Colorado Water Conservation Board to appropriate water to maintain the natural environment, and we will not intrude into an area where legislative prerogative governs. The degree of protection afforded the environment and the mechanism to address state appropriation of water for the good of the public is the province of the General Assembly and the electorate.

Conceptually, a public interest theory is in conflict with the doctrine of prior appropriation because a water court cannot, in the absence of statutory authority, deny a legitimate appropriation based on public policy.

---

**23.** This case dealt with the augmentation of existing rights and is not on point, but the principle is analogous.

Arapahoe County offered evidence that it intended to divert water for municipal use; this use of water has always been deemed a beneficial use under Colorado law and is given priority over other competing beneficial uses by the General Assembly. *See* § 37–92–305, 15 C.R.S. (1990 & 1994 Supp.). The cross-appellants do not cite any authority that authorizes a water court to deny an application for a conditional decree because of environmental concerns, and we reject the cross-appellants' invitation to create a complex system of common law to balance competing public interests.

## VII

We affirm the water court's dismissal of the application for a conditional water rights decree that Arapahoe County purchased from NECO. We reverse the water court's dismissal of Arapahoe County's remaining application for a conditional water rights decree and remand for further proceedings consistent with this opinion or for a new trial.

Justice MULLARKEY dissents, and Chief Justice ROVIRA and Justice SCOTT join in the dissent.

Justice SCOTT dissents.

Justice MULLARKEY dissenting:

The Board of County Commissioners for Arapahoe County (Arapahoe County) appeals from a judgment of the District Court, Water Division 4 (water court), dismissing Arapahoe County's application for determination of conditional water rights. I would reverse and remand this case for consideration of the application without requiring a showing of water availability. Accordingly, I respectfully dissent.

Arapahoe County applied to the water court for conditional water rights to construct and develop the Union Park Reservoir Project, which would divert water for instream use in the Gunnison River Basin and for use in Arapahoe County. Arapahoe County's application requested a conditional right for consumptive use of 900,000 acre-feet of water. The water would reach Arapahoe County via a trans-mountain diversion tunnel from the Gunnison River to the Antero Reservoir.

Over a five-year period, the water court considered the objections of a number of water users whose rights are senior to those sought by Arapahoe County. The water court entered pretrial orders establishing a framework for adjudicating the case and formulating the issues raised by Arapahoe County's applications for conditional water rights and the statements in opposition filed by other water users in the Gunnison River Basin. The water court ruled that Arapahoe County had the burden of proof in determining availability of water in the Gunnison River Basin. Thus, in phase I of the water court's hearing, the court heard evidence to determine whether the water was available for the Union Park Project.

The water court found that a maximum of 20,000 acre-feet of unappropriated water was "legally available" for appropriation on an annual basis at the points of diversion claimed by Arapahoe County. The water court also found that Arapahoe County had failed to meet its burden of proof and had not established that any additional unappropriated water was available. Arapahoe County decided not to proceed to the second phase of the proceedings because 20,000 acre-feet of water was insufficient for its needs. Accordingly, the water court dismissed the application and declared its findings.

Arapahoe County subsequently appealed the holding to this court, asserting that its computer modelling techniques were sufficient to meet the requirements to show availability. The majority affirms in part and reverses in part the water court, stating:

> [T]o acquire a conditional water right decree, an applicant must establish that there is a substantial probability that within a reasonable time water can and will be appropriated and put to a beneficial use. The applicant must prove, as a threshold requirement, that water is available based upon river conditions existing at the time of the application, in priority, in sufficient quantities and on sufficiently frequent occasions, to enable the applicant to complete the appropriation with diligence and within a reasonable time. When river conditions

existing at the time of the application for a conditional water right decree prevent completion of the proposed appropriation, there is no substantial probability that the project will be completed with diligence within a reasonable time.

Maj. op. at 962. The majority holds that the water court erred in requiring Arapahoe County to prove water availability based on the assumption that all absolute water decrees and all major conditional decrees will be exercised at the full decreed amounts. Maj. op. at 958–59. On that basis, it remands for a new trial or further proceedings. Maj. op. at 957. Although not requiring an applicant to take outstanding absolute water rights at face value, the majority requires an applicant to take some account of present demands on the river in proving the availability of water. Maj. op. at 962. The court states:

> Proof of such a substantial probability involves use of current information and necessarily imperfect predictions of future events and conditions.

Maj. op. at 961. The majority also holds that only absolute water rights should be considered to the extent of historical diversions when evaluating water availability.

I disagree with the analysis and the conclusion of the majority. In my view, the majority opinion extends the analysis presented in *Southeastern Colorado Water Conservancy Dist. v. City of Florence*, 688 P.2d 715 (Colo.1984), a case which is based on an erroneous understanding of the "can and will" statute. § 37–92–305(9)(b), 15 C.R.S. (1990). I would adhere to *Colorado River Water Conservation Dist. v. Vidler Tunnel Water Co.*, 197 Colo. 413, 594 P.2d 566 (Colo. 1979), and hold that an applicant for a conditional water right does not bear the burden of estimating the availability of water.

## I.

### A.

The "can and will statute" provides:

> No claim for a conditional water right may be recognized or a decree therefor granted except to the extent that it is established that the waters can be and will be divert-ed, stored, or otherwise captured, possessed, and controlled and will be beneficially used and that the project can and will be completed with diligence within a reasonable time.

§ 37–92–305(9)(b).

Under well-established rules of statutory construction, our primary task in construing a statute is to ascertain and to give effect to the intent of the general assembly. *Sigman v. Seafood Ltd. Partnership I*, 817 P.2d 527, 530 (Colo.1991). If possible, the court should determine the intent of the legislature from the plain language of the statute. *City of Lakewood v. Mavromatis*, 817 P.2d 90 (Colo. 1991); *McKinney v. Kautzky*, 801 P.2d 508 (Colo.1990). The legislative history of an act may be helpful in resolving questions of statutory interpretation. *People v. Emerterio*, 839 P.2d 1161 (Colo.1992).

### B.

The plain language of the statute itself does not require a showing that sufficient water will be available in the future to carry out the applicant's proposed project. Rather, the statute requires proof only of affirmative actions which are within the control of the applicant. *See, e.g., Public Service Co. v. Bd. of Water Works of Pueblo*, 831 P.2d 470, 478 (Colo.1992), *FWS Land and Cattle Co. v. State Div. of Wildlife*, 795 P.2d 837, 840 (Colo.1990). The statute requires that applicants establish that water "can and will be diverted, stored or otherwise captured, possessed and controlled and will be beneficially used and that the project can and will be completed with diligence and within a reasonable time." § 37–92–305(9)(b). Nothing in the text of the statute requires consideration of other water rights or other factors which are beyond the control of the applicant, even though those rights or factors ultimately may prevent the applicant from perfecting its water right. To the contrary, the language is limited to those affirmative acts which the applicant can take to demonstrate an intent to use the water if available. Thus, there is no textual support for the majority's interpretation.

### C.

Nothing in the legislative history shows an intent to require applicants to prove the availability of water. By enacting the "can and will" statute, the legislation codified part of the *Vidler* holding and prohibited the speculative acquisition of conditional as well as absolute water rights.[24] § 37–92–103(3)(a), 15 C.R.S. (1990); § 37–92–305(9)(b).

In *Vidler*, a Colorado corporation sought a conditional water storage decree for future trans-mountain diversions without any definite plans for use of much of the water. This court held that the applicant failed to establish the requisite intent necessary to grant the requested conditional water right. *Vidler*, 197 Colo. at 417, 594 P.2d at 568. We recognized that the applicant had shown an intent to use part of the water on its own property, but found that intent was not proved for the greater proportion of the water based on mere negotiations with various municipalities without firm contracts or agency relationships with the municipalities. Further, the court held that:

> [a] showing of actual, certain availability, or of a good faith belief in the availability, or unappropriated water is *not* a prerequisite for an award of a conditional right to waters from surface streams. An applicant for a *conditional* decree may know that at the time he applies no water is available for appropriation.

197 Colo. at 418, 594 P.2d at 569 (emphasis added in part). *See also, Fundingsland v. Ground Water Comm'n*, 171 Colo. 487, 468 P.2d 835 (1970).

Our original understanding of "speculation," as illustrated by *Vidler*, did not include speculation about the availability of water. *Vidler*'s interpretation of "speculation" was:

> The right to appropriate is for use, not merely for profit.... To recognize conditional decrees grounded on no interest beyond a desire to obtain water for sale would—as a practical matter—discourage those who have need and use for the water from developing it. Moreover, such a rule would encourage those with vast monetary resources to monopolize, for personal profit rather than beneficial use, whatever unappropriated water remains.

*Vidler*, 197 Colo. at 417, 594 P.2d at 568.

Using *Vidler* as a basis for preventing speculative acquisitions of water rights, Senate Bill 481 was proposed in response to a very large number of applications for conditional water rights sought by several related parties, often referred to as "the Huston filings."[25] Senator Anderson, the President of the Senate and the bill's Senate sponsor, stated at the opening of the Senate Floor Debates that:

> A lot of this [S.B. 481] was taken strictly out of court language that we've gone through, especially going back to the one that just came out on the twenty-third of April which was [the] Vidler Tunnel case, *Colorado River Water Conservation District v. Vidler*, and there's some really interesting language in here that, I think, helps us a great deal with the position the court has taken on this particular case in viewing the concern we have as far as the Huston filings and this type of thing because they go back and speak to the old *City and County of Denver v. Northern Colorado Water Conservancy District* case some years ago but it's interesting because they use language our Constitution guar-

---

**24.** The clearest statement in the statute of the intention of the legislature on this matter was in the revised definition of "appropriation." The legislature redefined appropriation as:

the application of a specified portion of the waters of the state to a beneficial use pursuant to the procedures prescribed by law; but *no appropriation of water*, either absolute or conditional, shall be held to occur *when the proposed appropriation is based upon the speculative sale* or transfer of the appropriative rights to persons not parties to the proposed appropriation....

§ 37–92–103(3)(a), 15 C.R.S. (1990) (emphasis added). *See also* Ch. 346, sec. 5, § 39–92–103(3)(a), 1979 Colo.Sess.Laws 1366, 1368.

**25.** *See, e.g., Southeastern Colorado Water Conservancy Dist. v. Huston*, 197 Colo. 365, 593 P.2d 1347 (1979). The water claimed by the Huston filings was not sought for use, but rather to gain control over vast quantities of water in anticipation of the opportunity to sell that water in the future at a profit.

antees *a right to appropriate, not a right to speculate,* and that's why this language ... is a part of this amendment I'm proposing here.

Senate legislative tapes, Floor Debates on S.B. 481, April 25, 1979, at 1:38 p.m. (emphasis added).

` Similarly, Representative Burford, Speaker of the House of Representatives and the House sponsor of the bill, opened the House floor debates by emphasizing that the purpose of the bill was to avoid speculative acquisition of water rights:

> [The bill] is an attempt to reaffirm what legislative intent has been on some of our past major pieces of water legislation. It is a direct reaffirmation of the legislative intent as to those pieces of legislation. It is felt by the sponsor in the Senate and myself that this reclarifying ... particular portions of the law will help in defeating some of the filings which have taken place throughout this state over the past two or three months. They are generally referred to as the Huston filings. They are now centered in one court in Arapahoe County, Judge Shivers' court. We feel that a reaffirmation of some of the thoughts that went into prior legislation will be helpful in the case and for that reason ask for your support of Senate Bill 481.

House legislative tapes, Floor Debates on S.B. 481, May 10, 1979, at 10:06 a.m.

Representative Burford's statements demonstrate an intention to reaffirm the existing law and not to change or overrule any decision by this court.[26] The intent of the General Assembly in enacting this statute was "to reduce speculation associated with conditional decrees and to increase the certainty of administration of water rights in Colorado." *FWS Land and Cattle Co.,* 795 P.2d at 840.

Thus, it is clear that the "can and will" statute was passed in reaction to speculative water applications, *e.g.,* the Huston filings, which were purely for pecuniary gain. I have found no indication in the legislative history that the legislature intended to require the applicant to show water availability. The majority cites no such authority, and I would conclude that there is none.

### D.

Because the majority's analysis is unsupported by either the statutory language or its history, the majority's rationale ultimately rests on our case law, primarily the *Florence* decision. After the enactment of the "can and will" statute, this court decided *Florence,* which involved the City of Florence's application for a conditional water right of 100 c.f.s. of Arkansas River water for municipal use. Objectors to the granting of the right argued that Florence was claiming more than it could ever use, citing factors such as the city's limited financial resources, low population projections, and the city's water intake and treatment facilities which were not designed to handle the large quantity of water sought. The objectors also claimed that the right would rarely, if ever, be in priority since the Arkansas river already was overappropriated. *Florence,* 688 P.2d at 715–17. We held that Florence's mere hope that the climate or river conditions would change in the future did not satisfy the "can and will" statute. *Id.* at 718. *Florence* did not expressly hold that the "can and will" statute overruled or substantially modified the holding of this court in *Vidler, Florence,* 688 P.2d at 717, although the opinion clearly can be read to have had that effect. The water court so interpreted *Florence* in the present case when it required a showing of water availability as a prerequisite to Arapahoe County obtaining a conditional water right.[27]

---

**26.** Contrary to the majority's holding, I do not believe that S.B. 481 extended *Vidler.* Rather, the legislative history demonstrates an intent on behalf of the legislature to codify *Vidler.* In fact, by requiring a showing of water availability, the majority effectively overrules *Vidler* to the extent that *Vidler* did not require a showing of water availability.

**27.** A comment in a current law review interprets our cases from *Florence* forward as effectively creating a judicial permitting system for water rights. Mark E. Hamilton, Comment, *The "Can and Will" Doctrine of Colorado Revised Statute Section 37–92–305(9)(b): Changing the Nature of Conditional Water Rights in Colorado,* 65 U.Colo. L.Rev. 947 (1994). The author notes that Colorado is the only prior appropriation state which does not have an administrative permitting

In my opinion, the "can and will" statute actually affirmed *Vidler* and was not intended in any way to overrule or modify that opinion. Thus, I would overrule or limit *Florence* to the extent that it casts doubt on the continuing validity of *Vidler*.

Principles of *stare decisis* ordinarily would weigh against overruling or limiting *Florence* with respect to its interpretation of the "can and will" statute. *Florence*, however, is entitled to no such deference because it contains no analysis of the "can and will" statute and how *Vidler* was impacted by its enactment. Instead, it merely notes that *Vidler* preceded enactment of the "can and will" statute. *Florence*, 688 P.2d at 717. While that statement is certainly true, it provides no basis for limiting *Vidler*. Nothing in the language of the statute or its legislative history suggests that the "can and will" statute was intended to affect *Vidler* in any way. In fact, as the history discussed above shows, the legislature looked to *Vidler* with approval. Thus, *Florence*'s conclusion that the "can and will" statute limited *Vidler* was erroneous.

With the exception of *Florence*, our prior applications of the "can and will" statute have been limited to matters within the applicant's control. For instance, in *FWS Land and Cattle Co.*, 795 P.2d at 840, we held that the applicant had failed to meet the criteria under the "can and will" statute because the applicant did not have an ownership right or access right to the reservoir site that was the source of water. Similarly, because a project is not viable if it is not economically feasible, we held that the "can and will" statute requires a showing of economic feasibility. *Public Service Co.*, 831 P.2d at 478. Under both of these cases, we required that the applicant make sufficient efforts to demonstrate that it actually could use the water if it was available. However, in neither case was an actual showing of availability required.

scheme. *Id.* at 969. Whether or not a permitting system is desirable is debatable. It is clear, however, that development and implementation of a permitting system requires many difficult policy choices to determine which applicants will

## II.

Construing the "can and will" statute as not requiring proof of water availability is more consistent with the constitution than the reading given by the majority. The Colorado Constitution, in relevant part, states:

Section 5. *Water of streams public property.* The water of every natural stream, not heretofore appropriated, within the state of Colorado, is hereby declared to be the property of the public, and the same is dedicated to the *use* of the people of the state, subject to appropriation as hereinafter provided.

Colo. Const. Art. 16, § 5 (emphasis added).

Article 6. *Diverting unappropriated water—priority preferred uses.* The right to divert the unappropriated waters of any natural stream to beneficial uses shall never be denied. Priority of appropriation shall give the better right as between those *using* the water for the same purpose; but when the waters of any natural stream are not sufficient for the service of all those desiring the use of the same, those *using* the water for domestic purposes shall have the preference over those claiming for any other purpose, and those *using* the water for agricultural purposes shall have preference over those *using* the same for manufacturing purposes.

Colo. Const. Art. 16, § 6 (emphasis added).

As *Vidler* held, the constitution guarantees a right to appropriate and not to speculate. *Vidler*, 594 P.2d at 568; *Denver v. Northern Colorado Water Dist.*, 130 Colo. 375, 408, 276 P.2d 992, 1009 (1954). The Colorado Constitution and its implementing statutes focus on an applicant's ability to put the water to some beneficial use and not on the availability of that water. *See, e.g., Southeastern Water Conservancy Dist. v. Rich*, 625 P.2d 977 (Colo.1981) (holding that a new appropriator will be allowed if no injury will occur to senior users on an overappropriated river). *Vidler* correctly warned that to do otherwise would "discourage those who have need and

receive how much water for what purpose. Those important choices do not seem susceptible to adjudication on a case-by-case basis without legislative guidance.

use for the water from developing it." *Vidler*, 594 P.2d at 568.

### III.

Finally, the majority's formulation of its required showing of water availability is arbitrary and unworkable. Under the majority's analysis, availability must be shown under river conditions "existing at the time of the application." Maj. op. at 957. The conditions at the time of the application may have little or no bearing on the actual availability of water when the water right is perfected. For example, availability of certain water supplies may be seasonal. In the winter or during the height of irrigation season, very little water may be available, whereas at other times, substantial water may be available. To penalize or reward an applicant simply because of the time the application was filed bears no relationship to the applicant's ability to put the water to beneficial use. As I see it, the majority's test actually undermines the policy goals of encouraging beneficial use and introduces an undesirable element of game-playing into the award of conditional water rights. Strictly applied, the majority's test will put conditional rights to an end.

### IV.

In conclusion, a determination of water availability is unnecessary and is not required by the statute. I would overrule *Florence* and reaffirm *Vidler*. I would remand this decision to the water court to reconsider the application for a conditional water decree in light of this holding.

Chief Justice ROVIRA and Justice SCOTT join in the dissent.

Justice SCOTT dissenting:

Arapahoe County's application seeking a conditional water decree permitting it to construct and develop the Union Park Reservoir Project was denied because Arapahoe County failed to prove sufficient water availability. Because I too would reverse and remand this case to the water court for consideration of the application of Arapahoe County for a conditional water rights decree, without requiring Arapahoe County to prove the availability of water because I believe such a requirement should not be read into our "can and will" statute, I join Justice Mullarkey in her dissent. I write separately only to make clear my view that although constitutional issues were not raised on appeal, the majority's interpretation of the "can and will" statute may, in fact, be in conflict with relevant constitutional provisions and our public policy of maximum utilization of the waters of Colorado.

The majority maintains that to acquire a conditional water rights decree, an applicant must "establish that there is a substantial probability that within a reasonable time the facilities necessary to effect the appropriation can and will be completed with diligence, and that as a result waters will be applied to a beneficial use." Maj. op. at 961. The majority then holds that Arapahoe County "must prove, as a threshold requirement, that water is available based upon river conditions existing at the time of ... application," *id.* at 962, and "in sufficient quantities and in sufficiently frequent occasions" to satisfy Arapahoe County's claimed conditional water right. *Id.* The majority concludes that conditional water rights under which diversions have been made must be considered. Because the calculus mandated by the majority necessarily includes conditional water rights that may later be abandoned before they would otherwise mature into absolute rights, I believe the majority's interpretation raises serious questions regarding the constitutional right to divert unappropriated waters to beneficial uses.

The Colorado Constitution in relevant part provides:

> Section 5. *Water of streams public property.* The water of every natural stream, not heretofore appropriated, within the state of Colorado, is hereby declared to be the property of the public, and the same is dedicated to the use of the people of the state, subject to appropriation as hereinafter provided.

Colo. Const. art. 16, § 5.

> Section 6. *Diverting unappropriated water—priority preferred uses.* The right to

divert the unappropriated waters of any natural stream to beneficial uses shall never be denied. Priority of appropriation shall give the better right as between those using the water for the same purpose; but when the waters of any natural stream are not sufficient for the service of all those desiring use of the same, those using the water for domestic purposes shall have the preference over those claiming for any other purpose, and those using the water for agricultural purposes shall have preference over those using the same for manufacturing purposes.

Colo. Const. art. 16, § 6. Pursuant to section 6, "the right to divert the unappropriated waters of any natural stream to beneficial uses shall never be denied" and can only be limited by "priority of appropriation." *Colorado River Water Conservation Dist. v. Vidler Tunnel Water Co.*, 197 Colo. 413, 415, 594 P.2d 566, 568 (1979).

While I agree with the majority that our "long established and legislatively recognized policy of maximum utilization of water provides guidance in construing the 'can and will' statute," maj. op. at 962, and that "[t]he policy of maximum beneficial use is derived from an understanding that the waters of Colorado are a scarce and valuable resource," *id.*, I believe that both public policy and the sometimes stark reality of our limited water resources militate against the majority's interpretation of our "can and will" statute. Because water resources are limited, our public policy requires that we seek their maximum utilization. A policy promoting the "maximum beneficial use" contemplates flexible and not static or forever fixed uses. Thus, we should abhor artificial bars to the most beneficial use.

In *Kelly Ranch v. Southeastern Colorado Water Conservancy Dist.*, 191 Colo. 65, 74–75, 550 P.2d 297, 304 (1976), we reasoned:

The fact that the rivers involved are overappropriated, rather than being an argument against [a plan for augmentation that does not introduce new water into a water system], is the very reason for the valid

exercise of ingenuity of persons seeking to maximize the use of water. . . .

Almost thirty years ago, Justice Groves, writing for the court in *Fellhauer*, opined that our system of water rights

[has] developed under article XVI, section 6 of the Colorado constitution [in which it] . . . is implicit . . . that, along with *vested rights*, there shall be *maximum utilization* of the water of this state. As administration of water approaches its second century the curtain is opening upon the new drama of *maximum utilization* and how constitutionally that doctrine can be integrated into the law of *vested rights.* We have known for a long time that the doctrine was lurking in the backstage shadows as a result of the accepted, though oft violated, principle that the right to water does not give the right to waste it.

*Fellhauer v. People,* 167 Colo. 320, 335–36, 447 P.2d 986, 994 (1968). Because the curtain has long risen and we are called to play a part in deciding how future water uses will be determined, I believe our application of law and public policy must permit future uses that we today cannot contemplate but which cannot arise if they are unduly burdened.

By following our previously limited holding in *Southeastern Colorado Water Conservancy Dist. v. City of Florence,* 688 P.2d 715 (Colo.1984), the right to "divert . . . unappropriated waters" is unduly burdened. This is so because requiring proof that sufficient water is available before application for a conditional water right, in effect, gives little force to the reality that over time, demographics and economic pressures change and so too the development of water rights under existing conditional water decrees, or the actual use to which either water yet to be appropriated and water diverted but to which a right has not been perfected may be applied. What may be a beneficial use an appropriator under a conditional decree is willing to risk developing today, may not prove to be the maximum beneficial use tomorrow, hence, it may not be the use to which resources will in fact be applied in later years. Consequently, a beneficial use that originally supported a particular condi-

tional right may not, in the marketplace for limited resources, support the continued development of such rights, leading later to the abandonment of water rights.

Inherent in our constitutional provisions is the reasonable assumption that we are rational maximizers of limited resources. Despite today's anticipated uses, however, precisely because behavior may be altered and circumstances exist beyond our control in the marketplace for water rights, there are three fundamental factors which must be considered before adopting any result: first, the law of supply and demand, that is, the relation between higher or maximum use and quantity; second, the idea that competition, when not impeded by unnecessary government intrusion into a free marketplace, will permit a free flow of water to uses that approximate maximum use or opportunity costs; and third, the fact that where the quantity of water is reduced by artificial scarcity, competitive equilibrium is lost and water will not gravitate toward the most beneficial or valuable use because there will no longer be a voluntary exchange. *See generally* David W. Barnes and Lynn A. Stout, *Cases and Materials on Law and Economics* 345 (1992) ("The key to the smooth operation of a free market economy is that buyers and sellers through the forces of demand and supply find the equilibrium price where demand equals supply. At that point, the economy operates most efficiently. It is at this price that resources will be best allocated.") (quoting *Standard Oil Co. of Ohio v. Federal Energy Admin.*, 612 F.2d 1291, 1296 (TECA 1979)); *see also* Richard A. Posner, *Economic Analysis of Law* § 1.1–1.3 (2d ed. 1977); Paul Anthony Samuelson, *Economics* 67–68, 630–32 (10th ed. 1976); *Chesapeake and Ohio Ry. Co. v. United States,* 704 F.2d 373, 376 (7th Cir.1983) ("The allocative-efficiency or consumer-welfare concept of competition dominates current thinking, judicial and academic, in the antitrust field.") (citing cases).

Failure to acknowledge economic forces will not result in maximum utilization. In its place will be uses inefficiently retained by long standing conditional decrees that, by the passage of time and the change of circumstances, may no longer be developed but abandoned.

It is not our role to determine which use ultimately will prevail. Under the majority's opinion and judgment, however, to the extent one use is prohibited from competing because an applicant cannot prove the availability of water, we grant to an existing use the legal right to interfere or inhibit a later, more beneficial use. This result will occur even if the later use is not more beneficial, because the right to compete is too easily burdened by the threshold requirement of proving water availability.

The majority, in the name of our "can and will" statute, charges unperfected rights *against* an applicant seeking a new conditional water right. Thus, the majority requires that Arapahoe County and future applicants for conditional water rights must take all present and future demands on the stream under absolute and unperfected water rights into consideration on application, i.e., prove the availability of water.

In my opinion, proving the availability of unappropriated water is an unrealistic requirement and creates too great a demand upon applicants for conditional water decrees. If an applicant is willing to pursue a conditional water right on the chance that the proposed beneficial use will continue to exist and that water will be available when the project comes on line, our constitution does not allow us to deny the applicant the right to attempt to divert those, as yet, unappropriated waters. Contrary to the judgment of the water court and the opinion of the majority, upon a showing of intent and ability, Arapahoe County should be permitted to apply for and obtain a conditional water decree, allowing it to proceed with development of such rights.

In sum, I would only require an applicant under our "can and will" statute to demonstrate the intent and ability to appropriate water before granting a conditional water decree, which represents the opportunity for one with a need and use of water to develop

that use and, if appropriate, later perfect that interest.