ASPEN WILDERNESS WORKSHOP,
INC., a Colorado non-profit
corporation, Petitioner,

v.

The COLORADO WATER CONSERVA-
TION BOARD, an agency of the State of
Colorado; Robert Tyler Martineau, Leo
M. Eisel, David L. Harrison, Robert A.
Jackson, James S. Lochhead, David E.
Meyring, Janice C. Sheftel, David H.
Smith, and Raymond B. Wright, individ-
ual members of the Colorado Water
Conservation Board; and Aspen Skiing
Company, Inc., Respondents.

No. 93SC740.

Supreme Court of Colorado,
En Banc.

June 19, 1995.

As Modified on Denial of Rehearing
Sept. 11, 1995.

Maynes, Bradford, Shipps & Sheftel, Frank E. "Sam" Maynes, Thomas H. Shipps, Durango, for amicus curiae Southwestern Water Conservation District.

Hobbs, Trout & Raley, P.C., Gregory J. Hobbs, Jr., Bennett W. Raley, Denver, for amicus curiae Northern Colorado Water Conservancy District and its Municipal Subdistrict.

Fairfield and Woods, P.C., Howard Holme, Stephen H. Leonhardt, Brent A. Waite, Denver, for amicus curiae Southeastern Colorado Water Conservancy District.

Kenneth A. Baker, P.C., Kenneth A. Baker, Salida, for amicus curiae Upper Arkansas Water Conservancy District.

Anderson, Gianunzio, Dude, Pifher & Lebel, P.C., Mark T. Pifher, Colorado Springs, for amicus curiae City of Colorado Springs.

Marjorie A. Miller, Grand Junction, for amicus curiae High Country Citizens' Alliance, Inc.

No appearance on behalf of respondents Robert Tyler Martineau, Leo M. Eisel, David L. Harrison, Robert A. Jackson, James S. Lochhead, David E. Meyring, Janice C. Sheftel, David H. Smith, and Raymond B. Wright, individual members of the Colorado Water Conservation Board.

Harding & Ogborn, Kevin M. Ward, Jane E. Lien, Denver, Sierra Club Legal Defense Fund, Lori Potter, Denver, for petitioner.

Gale A. Norton, Attorney General, Stephen K. ErkenBrack, Chief Deputy Attorney General, Timothy M. Tymkovich, Solicitor General, Patricia S. Bangert, Deputy Attorney General, Jennifer L. Gimbel, First Assistant Attorney General, Steven O. Sims, Assistant Attorney General, Natural Resources Section, Denver, for respondent Colorado Water Conservation Board.

Arnold & Porter, David S. Neslin, Lewis A. Steverson, Denver, for respondent Aspen Skiing Company, Inc.

Justice SCOTT delivered the Opinion of the Court.

Justice MULLARKEY dissents, and Chief Justice VOLLACK joins in the dissent.[1]

We granted certiorari before judgment of the court of appeals in *Aspen Wilderness*

---

[1]  An original opinion of the court and the dissent were announced on June 19, 1995. Chief Justice Rovira, who joined in the original dissenting opinion, retired from the court effective June 30, before petitions for rehearing were considered. Both opinions were subsequently modified and the petitions for rehearing were denied on September 11, 1995. Justice Kourlis, a member of the court as of July 17, 1995, did not participate in either the original opinions or consideration of the petitions for rehearing.

*Workshop, Inc. v. Colorado Water Conservation Board,* No. 92–CV–6091 (Denver Dist. Ct., July 2, 1993), pursuant to C.A.R. 50 to review the judgment of the Denver District Court.[2] On cross motions for summary judgment, the district court ruled that respondent Colorado Water Conservation Board ("Conservation Board" or "Board") had the implied or incidental authority not to fully enforce its water rights under a decree of the water court. The June 5, 1980 decree of the water court established the Board's instream flow water right on Snowmass Creek of 12 cubic feet per second (cfs), an amount that court held to be the minimum stream flow necessary to preserve the natural environment. Petitioner, Aspen Wilderness Workshop, Inc. ("Aspen Workshop"), asks that we determine "whether the Colorado Water Conservation Board has the authority to redetermine and administratively reduce a decreed instream flow right." Because we conclude that the Board has a statutory duty pursuant to section 37–92–102(3) of the Water Right Determination and Administration Act of 1969, §§ 37–92–101 to –602, 15 C.R.S. (1990 & 1994 Supp.), to appropriate water in a quantity that represents the *"minimum* stream flow" necessary to preserve the natural environment, and because, by its clear, unambiguous terms the 1980 water decree includes a determination that the full 12 cfs constitutes the minimum stream flow necessary to preserve the natural environment, we hold that the Board must implement the terms of the 1980 decree unless and until that decree is modified by order of the issuing water court. Accordingly, we reverse the ruling of the Denver District Court and remand this case with directions.

I

A

In January 1976, the Board determined that continuous flows of a minimum of 12 cfs of water year-round on Snowmass Creek were necessary to meet the statutory standards of preserving the natural environment to a reasonable degree.[3] Consistent with that determination, on January 16 the Board initiated an appropriation and first applied the water to beneficial use. On April 23, 1976, the Board made application in the water court, Water Division No. 5, to perfect its claim of the right to appropriate 12 cfs on Snowmass Creek. The Board's application set forth the source of water as "Snowmass Creek from Snowmass Lake to its confluence with the Roaring Fork River in Pitkin County, a distance of approximately 17 miles." The Board identified its proposed use of the water as: "The appropriation by the State of Colorado of such minimum flows as are required to preserve the natural environment to a reasonable degree." In addition, the Board stated the appropriation was made under the provisions of section 37–92–102.

On July 16, 1976, the Colorado River Water Conservation District ("Conservation District") filed a statement of opposition to the application and the subject appropriation proposed by the Board. The Conservation District challenged the application asserting, among other objections, that the "amount of water claimed is in excess of minimum natural flows" and that "the quantities of water claimed ... are unreasonable [and] unnecessary for the stated purposes."

On March 11, 1980, the water court referee and the division engineer met in conference, pursuant to section 37–92–302(4), 15 C.R.S. (1990), and determined that sufficient "water is available for appropriation" under the provisions of section 37–92–102(3).[4] On December 28, 1979, the statement of opposition was withdrawn by the Conservation District and the Board's application was again referred to the water referee by the water judge.

---

2. C.A.R. 50 provides that we may grant certiorari to review a case newly filed or pending in the court of appeals before judgment is decided by that court.

3. In *Matter of Bd. of County Comm'rs,* 891 P.2d 952, 958 n. 3 (Colo.1995), we noted that a "major ... water right" had been defined as one involving 10 cfs and at least 1,000 acre feet for storage rights. Although the Conservation Board's appropriations do not include storage rights, the volume of water at issue here is significant without considering environmental impact.

4. However, the division engineer recommended that provision be made in any decree "requiring that the [Conservation Board] provide adequate measuring devices for the proper administration of the stream flow."

On March 21, 1980, the water court referee issued a Ruling of Referee only after "having made such investigations as are necessary to determine whether or not the statements in the application are true." Concluding the representations of the Board were true, the referee ruled that

> the application should be granted and that 12.0 cubic feet of water per second of time are hereby awarded for the purpose of maintaining a minimum stream flow as required to preserve the natural environment to a reasonable degree on Snowmass Creek ... absolutely and unconditionally; subject, however, to all earlier priority rights of others....

The referee's ruling was not questioned by any party, including the Board. On June 5, 1980, the water judge made the referee's ruling a decree of the water court.

### B

In 1991, because of additional development in the Aspen area, the 1976 appropriation which was the subject of the June 1980 decree was questioned by Pitkin County officials, including the Aspen/Pitkin County Planning Office ("Planning Office"). In September 1991, the Planning Office staff contacted the Division of Wildlife ("Division"), seeking information regarding the Division's experience in dealing with instream flow issues as they related to snowmaking as well as the Division's definition of a "survival flow."[5] In response to that inquiry, a Division instream flow coordinator conducted an on-site investigation of the water flow within Snowmass Creek.

The Division instream flow coordinator informed the Conservation Board of his investigation and made recommendations to the Board regarding Snowmass Creek.[6] The instream flow coordinator expressed concern that the 12 cfs appropriation was too high during certain periods of the year and too low during other periods and suggested the possibility of a computational error in the original data used to establish the 12 cfs instream flow figure in the Board's application and the subsequent June 5, 1980 water decree. On behalf of the Conservation Board, Dan Merriman, Section Chief of the Water Rights Investigations Section of the Conservation Board, issued a memorandum dated February 24, 1992, to Board members and interested parties stating:

> Due to the interest expressed by all parties over the resource values of Snowmass Creek, the Board's responsibility to appropriate minimum stream flows to preserve the natural environment to a reasonable degree, and the recent availability of data which was not available when the Board's original appropriation was made, I have requested the Division of Wildlife to prepare a recommendation for winter low-flow conditions on Snowmass Creek for the Board's consideration.

When the Division completed its investigation and analysis regarding the instream water flow on Snowmass Creek, it concluded that the original 1976 appropriation and the June 1980 decree were based on a computational error, and that the original data yielded different results when evaluated using up-to-date criteria.

At its March 1992 meeting, the Board determined that the new information now available warranted a re-examination of its Snowmass Creek instream flow water rights.

---

**5.** The term "survival flow," used by the Planning Office and the Division, does not appear in § 37–92–102 and has not been defined by this court. By this opinion, we express no view as to whether the use of the phrase "survival flow" by the Planning Office or the Division is coterminous with "minimum stream flow," a term appearing in that statute and relevant here. According to the Division instream flow coordinator, "survival flow" is a term used under agreements existing between the Department of Natural Resources, the three Summit County ski areas, and the Vail Valley Consolidated Water District in which an absolute minimum acceptable stream flow had been established below which the various ski areas would not divert water for commercial ski resort purposes. The Division coordinator explained that, in his opinion, "those flow values were 'survival flows.' "

**6.** Section 37–92–102(3) provides that prior to the initiation of any appropriation or acquisition, the Conservation Board "shall request recommendations from the division of wildlife and the division of parks and outdoor recreation." That section also requires the Board to seek recommendations from the United States Department of Agriculture and the United States Department of the Interior; however, no such recommendations are a part of the record before us.

Consistent with that determination, at its May, July, and September 1992 monthly meetings, the Board received public comment concerning its Snowmass Creek water rights. Based on fieldwork performed in the Fall of 1991 and the Spring of 1992, the Division recommended that rather than maintaining the original year-round appropriation of 12 cfs for the entire length of Snowmass Creek, that the creek be divided into three sections with each section possessing individual summer and winter instream flow requirements. On April 1, 1992, the Division proposed the following changes:

Snowmass Lake to West Snowmass Creek (4.9 miles)

SUMMER: Reduce instream flow from 12 cfs to 9 cfs.

WINTER: Reduce instream flow from 12 cfs to 4 cfs.

West Snowmass Creek to Capitol Creek (10.7 miles)

SUMMER: Increase instream flow by 3 cfs from 12 cfs to 15 cfs.

WINTER: Reduce instream flow from 12 cfs to 7 cfs.

Capitol Creek to the Roaring Fork River (1.4 miles)

SUMMER: Increase instream flow by 10.5 cfs from 12 cfs to 22.5 cfs.

WINTER: Reduce instream flow from 12 cfs to 11 cfs.

The Conservation Board subsequently received several written statements and heard oral presentations responding to the proposed modifications.[7] Based upon the evidence presented, the Conservation Board decided that the proposed modifications on Snowmass Creek were appropriate.

At its September 15, 1992 meeting, the Board took final action, adopting the recommendations of its staff and the Division. Those recommendations called for the Board to modify or change its water rights. To do so, the Board decided that it would not enforce its full 12 cfs water rights in those sections of Snowmass Creek where the 1976 appropriation exceeded the summer or winter instream flow designations proposed by the Division. In addition, where the proposed seasonal flow exceeded the minimum stream flow under the 1980 decree, the Board decided to initiate proceedings before the water court in order to increase the Board's water rights above 12 cfs.[8]

II

On September 16, 1992, Aspen Workshop filed suit in the Denver District Court. Aspen Workshop argued that the Conservation Board's decision not to enforce the full instream flow appropriation on Snowmass Creek amounted to a permanent relinquishment of a public instream flow right, and that the decision to relinquish was improperly based on an informal administrative process rather than a formal adjudicative proceeding before the water court. Aspen Workshop's complaint stated several causes of action including: The Conservation Board's action exceeded its authority; the Conservation Board's action infringed upon the authority of the water court; the Conservation Board's action constituted a donation of a public resource to a private company (the Aspen Skiing Company which planned to divert the excess water during the winter for snowmaking); the Conservation Board's decision breached its fiduciary duty to the public; the decision was not supported by substantial evidence; and the Conservation Board's decision was invalid because it did not adopt new rules and regulations to follow with respect to that decision.

On December 7, 1992, the Conservation Board filed a motion for summary judgment. The Aspen Skiing Company intervened and filed a memorandum in support of the motion for summary judgment.[9] The district court

---

7. The record reflects that the proposed reduction of Snowmass Creek's minimum stream flow was both strongly opposed and supported by some Snowmass community members and local organizations. The Board heard from scientific consultants and considered over 150 pages of technical reports.

8. In order to increase its appropriations, the Conservation Board cannot merely redetermine and administratively *increase* a decreed instream flow right without first making application before the water court and securing an appropriate water decree from that court.

9. The record indicates that the Aspen Skiing Company was interested in increasing its snowmaking operations on Snowmass Creek, and that it would be able to do so if the Conservation

granted summary judgment on July 2, 1993, holding that none of the claims presented by Aspen Workshop had merit.

The district court held that the Conservation Board was acting within its inherent power to rectify errors and its implied authority to modify its appropriation on Snowmass Creek; that the Board, as any holder of a water right, need not enforce its rights and may voluntarily not use that portion of its decreed water rights in excess of the amount needed; and that any such corrective modification did not require adjudication by the water court.

Aspen Workshop appealed the order of the district court granting summary judgment. We granted certiorari under C.A.R. 50(a) because we agree that the issues raised by the order granting summary judgment justify our immediate review.

### III

■ Summary judgment is appropriate only if the pleadings and supporting documents demonstrate that there is no genuine issue for trial as to any material fact and that the moving party is entitled to summary judgment as a matter of law. C.R.C.P. 56. The burden is on the moving party to establish that no genuine issue of fact exists and any doubts in this regard must be resolved against the moving party. *Greenberg v. Perkins*, 845 P.2d 530, 531 (Colo.1993); *Bunger v. Uncompahgre Valley Water Users Ass'n*, 192 Colo. 159, 557 P.2d 389 (1976).

■ Our review of a judgment granting a motion for summary judgment is *de novo*. *See Cung La v. State Farm Auto Ins. Co.*, 830 P.2d 1007 (Colo.1992). In light of the following considerations, we hold that the district court erred when it granted summary judgment over a matter not within its jurisdiction as an administrative matter.

### A

The Conservation Board asserts that it had a duty to modify the stream flow once it discovered that a mistake had been made and it had appropriated an instream flow in ex-

cess of the statutory standard. We do not find fault with this assertion. However, the Conservation Board further argues that despite the June 1980 water decree, Aspen Workshop's claims are without merit because the Board acted within its legislatively prescribed authority by unilaterally modifying its appropriation of the instream flow of Snowmass Creek. Because the Board only has the authority to make appropriations consistent with its statutory duty, we disagree.

The General Assembly granted the Conservation Board its authority and power of appropriation at section 37–92–102(3), 15 C.R.S. (1990):

> The Colorado water conservation board is hereby vested with the exclusive authority, on behalf of the people of the State of Colorado, to appropriate in a manner consistent with sections 5 and 6 of article XVI of the state constitution, such waters of natural streams and lakes as the board determines may be required for minimum stream flows or for natural surface water levels or volumes for natural lakes to preserve the natural environment to a reasonable degree.

The Conservation Board has interpreted the statute as vesting the agency with the independent authority to appropriate waters as it determines. Implicit with that authority, the Board argues it has the power to reduce its appropriations below the amount set forth in its March 1980 water decree.

■ Contrary to the Conservation Board's suggestion, however, section 37–92–102(3) does not create in the Board a blanket grant of authority as to its appropriation of instream flow waters. Instead, that statute makes the Conservation Board a unique entity charged with preserving the natural environment to a reasonable degree for the people of the State of Colorado. While that statute does create the right to appropriate waters of the state, the actual authority granted is limited in two important respects: First, section 37–92–102(3), while creating a right to appropriate such waters, burdens the actions of the Board by creating a unique

Board's winter appropriation for Snowmass Creek was reduced.

statutory fiduciary duty between the Board and the people of this state so that the Board may only appropriate a particular amount of water, i.e., the minimum amount necessary to preserve the natural environment; second, and equally controlling here, the Board's decreed water rights on Snowmass Creek, as adjudicated by the water court and set forth in the June 5, 1980 water decree, are designated as the "minimum stream flow as required to preserve the natural environment to a reasonable degree."

1

■ Despite certain general duties set forth by the legislature in sections 37–60–102 and 37–60–106,[10] the authority expressly exercised by the Board in its application before the water court is found in section 37–92–102(3). While that section expands the power and duty delineated by section 37–60–106, it does not serve as a grant of unlimited authority. Section 37–92–102(3) places a limit on which waters the Conservation Board may choose to appropriate and the purposes for which the Conservation Board may effect such appropriations. That statutory authority grants the Board the right to determine and appropriate only the minimum amount of water necessary for the preservation of the environment. As the controlling statute describes it, the Conservation Board has "exclusive authority" only to appropriate "such waters of natural streams and lakes as the board determines may be required for *mini-*

*mum* stream flows to preserve the natural environment to a reasonable degree." § 37–92–102(3). Because the Board has the duty to appropriate *only* the minimum amount of water necessary to reasonably preserve the environment, its water rights, as determined by the water court, and its actual appropriation must comport with that duty. The Conservation Board is thus not at liberty to freely appropriate any body of water for any purpose or beneficial use it determines.[11] Rather it must confine its appropriations and other actions to the express statutory purpose of maintaining minimum stream flows necessary to preserve the natural environment to a reasonable degree.

2

■ In addition to limiting the Board's authority with respect to appropriations, section 37–92–102(3) recognizes that the Board's authority is not plenary as to its own water rights. Rather, the Conservation Board, as any other appropriator, may perfect its water rights by applying for and obtaining a decree from the water court. The responsibility of the Board to seek a water court decree is contemplated by the very language of section 37–92–102(3), which states the Board may obtain an "*adjudication*" of water rights pursuant to this article and other applicable law," that the Board "may initiate such applications ... for ... water rights, ... including applications for changes of water rights,"[12] and that the Board's filings shall

10. As set forth by a federal trial court in 1954, *Williamson v. Union Oil Co.*, 125 F.Supp. 570 (D.Colo.1954), originally the scope of the Conservation Board's authority was "to *promote* the conservation of waters of the state of Colorado in order to secure the greatest utilization of such waters." § 37–60–106(1) (emphasis added). The scope of the Board's authority to *promote* conservation and utilization of our waters as set forth in § 37–60–106 is not at issue here. That section specifically sets forth the powers and duty of the Board in its efforts to promote conservation and the greatest utilization of the state's waters. However, authority under § 37–60–106 is not at issue here as the appropriation on Snowmass Creek is not "in the name of the department of natural resources" as contemplated by § 37–60–106(1)(m), nor is the appropriation for projects sponsored by the Board, § 37–60–106(1)(n), as described in §§ 37–60–119 and 37–60–120.

11. "Beneficial use" is defined as:

the use of that *amount* of water that is reasonable and appropriate ... to accomplish *without waste* the purpose for which the appropriation is lawfully made.... For the benefit and enjoyment of present and future generations, 'beneficial use' shall also include the appropriation by the state of Colorado in the manner prescribed by law of such minimum flows between specific points or levels for and on natural streams and lakes as are required to preserve the natural environment to a reasonable degree.

§ 37–92–103(4), 15 C.R.S. (1990) (emphasis added).

12. "Change of water right" is defined in § 37–92–103(5). That definition, in its last sentence, provides: "The term 'change of water right' *includes* changes of conditional water rights as

be "consistent with other appropriations and with the requirements of [our water law]." § 37–92–102(3) (emphasis added). The Conservation Board must, therefore, prove that the statutory requirements of section 37–92–102(3) have been met in order to prevail in its application for an order establishing its water rights. Once the water court has issued a decree, that decree becomes controlling as to the right to appropriate water. Section 37–92–102(3)(c) requires that:

> *Before initiating a water rights filing*, the board shall determine that the natural environment will be preserved to a reasonable degree by the water available for the appropriation to be made; that there is a natural environment that can be preserved to a reasonable degree with the board's water right, *if granted;* and that such environment can exist without material injury to water rights.

(Emphasis added.) Furthermore, the Conservation Board's authority was not created as a limit upon the "exclusive jurisdiction of water matters" reposed in the water courts by the General Assembly at section 37–92–203, 15 C.R.S. (1990):

> There is established in each water division the position of water judge of the district courts of all counties situated entirely or partly within the division. Said district courts collectively acting through the water judge have *exclusive jurisdiction of water matters* within the division, and no judge other than the one designated as a water judge shall act with respect to water matters in that division.

well as *change of water rights."* (Emphasis added.) A "water right" is defined as "a right to use in accordance with its priority a *certain portion* of the waters of the state by reason of the appropriation of the same." § 37–92–103(2) (emphasis added). (As previously discussed, " 'appropriation' means the application of a *specialized portion* of the waters of the state to a beneficial use...." § 37–92–103(3)(a) (emphasis added)).

**13.** We note that the conduct of the Board at its September 15, 1992 meeting acknowledged, at least in part, the authority of the water court. At that meeting, when the Board decided to initiate proceedings before the water court to increase its water rights above 12 cfs, it in effect agreed that it did not have the unilateral authority to increase its water rights.

(Emphasis added.) The water court's "exclusive jurisdiction" was not altered or limited by the creation of the Conservation Board. Thus, the Conservation Board's authority is therefore subject to statutory limits and to water rights adjudications of the water court.[13]

### B

The district court, in granting summary judgment for the Conservation Board, held that even though the decree confirmed the Board's initial determination that 12 cfs was "necessary to maintain environmental standards," the Board did not have to seek water court review of its decision not to enforce all of its decreed water right under the June 1980 decree. The district court concluded the "water court ... never adjudicated the issue of exactly how much water was necessary," but rather merely confirmed the findings of the Board. Concluding such lack of enforcement was a method by which to correct an earlier error, the district court ruled that:

> a holder of a water right may voluntarily not use that portion of its water right in excess of the amount needed. C.R.S. Section 37–92–305(4)(b). Like any other holder of a decreed water right, the Board has the express statutory authority to not use all of its decreed water rights. That express authority necessarily includes the ability to relinquish a portion of a decreed water right if, at a later time, the Board determines that a relinquishment of the water right is appropriate. C.R.S. Section 37–92–102(3).[14]

**14.** The district court cited two statutes in its July 2, 1993 order. Section 37–92–305(4)(b) provides that if a proposed change or plan in a water right would cause an injurious effect, the water judge or referee may provide as a term and condition to prevent injury, "the relinquishment of part of the decree for which the change is sought or the relinquishment of other decrees owned by the applicant which are used by the applicant in conjunction with the decree for which the change has been requested, if necessary, to prevent an enlargement upon the historic use or diminution of return flow to the detriment of other appropriators." This section does not provide for the voluntary relinquishment of a water right.

Section 37–92–102(3), the Conservation Board's enabling act, as we read it, does not

While we agree that the Conservation Board's administrative actions to correct its original erroneous determination as to the amount of water necessary for minimum stream flow to protect the environment may have been reasonable, we reject the district court's rationale which permits the Board to unilaterally modify its appropriation contrary to a lawful order of the water court, i.e., the June 5, 1980 decree, especially since the decree was issued on the Board's application. Unlike the district court, we find that by its clear language, the decree of the water court does set forth "exactly how much water was necessary" to preserve the environment. That order states quite plainly as follows: (1) that the Board's "statements in [its] application are true"; (2) that the "use of the water is to appropriate such minimum stream flows as are required to preserve the natural environment to a reasonable degree"; (3) that the "amount of water claimed is 12.0 cubic feet of water per second of time"; and (4) that the "application should be granted and that 12.0 cubic feet of water per second of time are hereby awarded for the purpose of maintaining a minimum stream flow as required to preserve the natural environment."

In light of the determinations and ruling of the water court, the Conservation Board must return to the water court to modify the original decree before reducing its appropriation on Snowmass Creek. Two policy considerations require this result: First, the 1980 water decree, a lawful order of the water court, must be given full force and effect by its terms until modified by the water court. Second, the Conservation Board, unlike other appropriators of water, is imbued with

unique statutory responsibilities and, because its authority is circumscribed by statute, it therefore must be held to a different standard than other appropriators.

The district court determined that the Conservation Board had the authority not to enforce all of its decreed water rights "like any other holder of a decreed water right." We disagree. Section 37–92–102, in giving the Board its authority to appropriate water, did not grant the Board the power to unilaterally modify lawful decrees of the water court.[15]

The district court cited *Rominiecki v. McIntyre Livestock Corp.*, 633 P.2d 1064, 1067 (Colo.1981), to support its holding that "in the proper exercise of its authority, the Board may determine that its minimum stream flow water right is excessive and determine not to enforce the excessive portion." Unlike the applicants for water rights in *Rominiecki*, however, the Board is subject to conditions imposed by statute. Furthermore, the Conservation Board, unlike other water users, acts on behalf of the people of the state of Colorado and is thereby burdened with a fiduciary duty arising out of its unique statutory responsibilities. The Board initiates water appropriations in fulfillment of its unique statutory responsibilities to secure and appropriate the "minimum stream flow" necessary to preserve the environment. Once a judicial determination is made with regard to the actual amount or what "minimum stream flow" is necessary to protect the environment, the Conservation Board is obligated to abide by that judicial determination and thereby to fulfill its duty to the people of

provide for the autonomous relinquishment of any appropriation by the Board.

**15.** Other holders of water rights may elect to not use all of their decreed water rights. We have previously acknowledged that absolute water rights are not in all instances exercised to the full extent or for the full time period permitted in the decrees by which they were obtained. *Matter of Bd. of County Comm'rs*, 891 P.2d 952, 958 (Colo. 1995). In addition, parties other than the Board may appropriate water for beneficial uses much broader than the authority by which the Board acts. Instead, consistent with the relevant statute defining "beneficial uses," the Board's au-

thority is limited by statute to preserving the natural environment to a reasonable degree in the manner prescribed by law "[f]or the benefit and enjoyment of present and future generations." § 37–92–103(4). "Beneficial use" for all other appropriators includes "the use of that amount of water that is reasonable and appropriate under reasonably efficient practices to accomplish without waste the purpose for which the appropriation is lawfully made and, *without limiting the generality of the foregoing,* includes the impoundment of water for recreational purposes, including fishery or wildlife." *Id.* (emphasis added).

this state,[16] other appropriators of water as well as those without water rights, by appropriating only so much water as is necessary to preserve the environment, the full extent of its statutory authority and decreed rights. On the other hand, if the Conservation Board subsequently determines that a previously adjudicated appropriation must be altered in order to maintain necessary minimum stream flows, it then may return to the water court to petition for appropriate changes to its decreed water rights. § 37–92–102(3).

The Conservation Board is, therefore, unlike other parties who seek to appropriate and use water. The Conservation Board may only appropriate such waters as "may be required for *minimum* stream flows ... to preserve the environment." In its application before the water court, the Board confirmed that it had determined that 12 cfs was the minimum amount of water necessary to serve the statutory purpose of the Board. In reliance upon that representation and in the face of initial opposition, the water court did determine and rule that 12 cfs was, in fact, "a minimum stream flow as required to preserve the natural environment to a reasonable degree on Snowmass Creek." Once the water court issued its decree setting forth that amount, the Board was required to abide by the ruling of the water court.

### C

■ The Conservation Board has a unique statutory fiduciary duty to protect the public in the administration of its water rights decreed to preserve the natural environment. The Conservation Board concedes, as its application before the water court states, that its appropriations on Snowmass Creek are made under the Water Right Determination and Administration Act of 1969, §§ 37–92–101 to –602. The Board's instream appropri-

ations fall within the jurisdiction of the water court and must be "consistent with other appropriations." *See* § 37–92–102(3)(a)-(e). Section 37–92–102(3)(e) provides, in pertinent part:

All recommendations, including those of the United States, which are transmitted to the [B]oard for water to be retained in streams or lakes to preserve the natural environment to a reasonable degree must be made with specificity and in writing in order that any appropriation made by the [B]oard may be integrated into the statewide system for the administration of water rights. Filings for appropriations by the [B]oard shall be consistent with other appropriations and with the requirements of this article.

Section 37–92–102 applies to appropriations, which includes not only the original appropriation, but also changes or modifications of an appropriation that were made to fulfill the Board's duty to protect the environment[17] by preserving the minimum stream flow. It is not within the Board's statutory authority to alter or change the water court's decree.

Finally, the Board's reliance upon *Weibert v. Rothe Bros., Inc.*, 200 Colo. 310, 618 P.2d 1367 (1980), to suggest that the June 5, 1980 water decree only "confirms" that necessary steps were taken by the Board to complete its appropriation, is misplaced. The issue before the water court in *Weibert* was whether, pursuant to a water decree, "the doctrine of res judicata barred any inquiry into *historical use* of [a] water right *prior* to ... the date of adjudication." *Id.* at 317–18, 618 P.2d at 1372 (emphasis added). Concluding that "historical use was not in issue in adjudication of the [subject] water right," *id.*, we held that "the decree awarding that right is not res judicata as to historical use." *Id.* at

---

**16.** Recognizing that the use of all waters in the state affects the "future welfare of the state" and "the need to correlate the activities of mankind with some reasonable preservation of the natural environment," the General Assembly vested the Board with the obligation to act "on behalf of the people of the state of Colorado" so as to appropriate "such waters of natural streams or lakes as ... may be required for minimum stream

flows ... to preserve the natural environment to a reasonable degree." § 37–92–102(2), (3).

**17.** Section 37–92–102(3)(c.5), 15 C.R.S. (1994 Supp.), is applicable only to those applications for water rights filed by the Board on or after July 1, 1994. However, § 37–92–102(3)(c.5) reflects the General Assembly's intent that the Board must proceed through the water court to change a decreed conditional water right.

318, 618 P.2d at 1373. It requires an overly broad reading of our holding in *Weibert* to suggest, as the Board argues, that the June 1980 water decree does no more than confirm "that steps have been completed to effect an appropriation." [18] By its very terms, the June 1980 decree stated the purpose of the appropriation, i.e., "to appropriate such minimum stream flows as required to preserve the natural environment to a reasonable degree," and set forth a certain portion or amount of water to be so appropriated by the Board, i.e., the "amount of water claimed is 12.0 [cfs]."

In addition to the foregoing, both the Board's duty and its authority to appropriate instream flow find their source in the Water Rights Determination and Administration Act of 1969 rather than in section 37–60–106, a statutory provision that sets forth general and administrative powers and duties of the Board. Thus, we can only view the Board's actions regarding such appropriations as involving water matters reserved for our water courts.

## IV

■ In sum, the General Assembly vested the Conservation Board with "exclusive authority" to appropriate water as may be required for minimum stream flows to preserve the natural environment" and burdened the Board's authority with a fiduciary duty arising out of its unique statutory responsibilities that is coterminous with its right to appropriate water. However, at the same time, the General Assembly did not alter the "exclusive jurisdiction" of our water courts over water matters. Hence, once a decree is issued on the Board's application determining the instream flow by volume, i.e., 12 cfs, as necessary to preserve the natural environment to a reasonable degree, the Board cannot unilaterally modify and must implement the decree unless and until its rights are

modified, after application for change, filed with the water court.

Accordingly, we reverse the ruling of the district court granting the Colorado Water Conservation Board's motion for summary judgment and remand this matter to the district court with directions that it vacate its order granting summary judgment.

MULLARKEY, J., dissents, and VOLLACK, C.J., joins in the dissent.

Justice MULLARKEY dissenting:

At issue in this case is whether the Colorado Water Conservation Board (CWCB) has the authority to redetermine and administratively reduce a decreed instream flow right, and, if so, whether the CWCB's decision was supported by substantial evidence. The majority holds that, because the water court has "exclusive jurisdiction" over water matters, "once a decree is issued on the [CWCB's] application determining the instream flow ... necessary to preserve the natural environment to a reasonable degree, the Board cannot unilaterally modify and must implement the decree unless and until its rights are modified, after application for change, filed with the water court." Maj. op. at 1261.

Because I do not find this holding to be supported by the express or implied terms of the statutory scheme governing instream flow rights, I respectfully dissent. I would hold that (1) the CWCB need not seek modification of an instream flow decree in water court before deciding not to seek enforcement of its full decreed right; and (2) the CWCB's decision to enforce less than the decreed instream flow right for Snowmass Creek is supported by substantial evidence.

Pursuant to the Colorado Administrative Procedure Act (APA), §§ 24–4–101 to 108, 10A C.R.S. (1988 & 1994 Supp.), Aspen Wilderness Workshop, Inc., (AWW) challenges CWCB's decision to enforce less than its full instream flow right.[1] Under the APA,

18. Nonetheless, we also noted that "[o]ne of those steps is application of water to beneficial use." *Weibert,* 200 Colo. at 317, 618 P.2d at 1372. Under § 37–92–103, the Board's use is limited to that "minimum stream flow as required to preserve the natural environment to a reasonable degree."

1. AWW also challenges the CWCB's decision on due process grounds. It argues that "the people are the true beneficiaries of the right and, as such, cannot be deprived of their property interest without due process." This argument is without merit.

any person adversely affected or aggrieved by any agency action may commence an action for judicial review in the district court. . . .

§ 24–4–106(4). If the district court finds no error, it shall affirm the agency action. If it *finds that the agency action is arbitrary* or capricious, *a denial of statutory right,* contrary to constitutional right, power, privilege, or immunity, *in excess of statutory jurisdiction, authority, purposes, or limitations, not in accord with the procedures or procedural limitations* of this article or as *otherwise required by law, an abuse or clearly unwarranted exercise of discretion,* based upon findings of fact that are clearly erroneous on the whole record, *unsupported by substantial evidence when the record is considered as a whole,* or otherwise contrary to law, then *the court shall hold unlawful and set aside the agency action* and shall restrain the enforcement of the order or rule under review, compel any agency action to be taken which has been unlawfully withheld or unduly delayed, remand the case for further proceedings, and afford such other relief as may be appropriate.

§ 24–4–106(7) (emphasis added). The district court found that the CWCB's decision was not in excess of its authority and was supported by substantial evidence and granted summary judgment in favor of CWCB. Because I would hold that the CWCB acted within its statutory authority, I must address both issues.

## I.

The majority asserts that "[s]ection 37–92–102, in giving the [CWCB] its authority to appropriate water, did not grant the [CWCB] the power to unilaterally modify lawful decrees of the water court." Maj. op. at 1259.[2]

Due process protections do not attach to undifferentiated public property interests. "When governmental action affects more than a few individuals, concerns beyond economy, efficiency, and expedition tip the balance against finding that due process attaches. We may expect that as the sweep of governmental action broadens, so too does the power of the affected group to protect *its interests outside rigid constitutionally imposed procedures." O'Bannon v. Town Court Nursing Center,* 447 U.S. 773, 799–800, 100 S.Ct. 2467, 2483, 65 L.Ed.2d 506 (1980) (Blackmun, J., concurring). Accordingly, when as here CWCB's decisions affect the public as a whole, no additional constitutional protections apply.

I note also that the public has been afforded considerable process in this case nevertheless. Based on investigations on Snowmass Creek by the Division of Wildlife, CWCB became aware that the minimum stream flow appropriation might be too high at some times of the year and too low at others. CWCB gave public notice that the matter would be considered at its March, 1992, meeting. At that meeting, CWCB decided to reconsider the instream flow right. The board received public comment at meetings in May, July and September which included testimony from biological consultants from the County, Aspen Skiing Company and AWW, and extensive technical reports. It did not take final action until its September 15, 1992, meeting.

Furthermore, because the CWCB's decision is not subject to constitutional scrutiny does not mean it is not subject to review. CWCB's decisions are subject to procedural requirements and judicial review under the APA, as discussed in the text of this dissent. I would find that public interests represented by AWW thus have received all of the process these interests are due without additional review by the water court.

**2.** The majority apparently buttresses this assertion by distinguishing CWCB from other water users who may "appropriate water for beneficial uses much broader than the authority by which the Board acts." Maj. op. at 1259 n. 14. Specifically, the majority asserts that under the statutory definition of beneficial use, § 37–92–103(4), "the Board's authority is limited by statute to preserving the natural environment to a reasonable degree" while others may appropriate "that amount of water that is reasonable and appropriate . . . to accomplish . . . the purpose for which the appropriation is lawfully made." Maj. op. at 1259 n. 14.

However, CWCB's authority to appropriate water is not limited to preservation of the environment pursuant to the statutory definition of beneficial use, section 37–92–103(4), as the majority asserts. The broader mandate of the CWCB is to "aid[ ] in the *protection* and *development* of the waters of the state . . . for the benefit of the present and future inhabitants of the state." § 37–60–102 (emphasis added). To this end, since 1971, the CWCB has the authority to file applications and take "all action necessary" to acquire or perfect water rights for the full range of projects sponsored by the CWCB. § 37–60–106(1)(m) & (1)(n); *see* Ch. 379, sec. 1, § 149–1–11, 1971 Colo.Sess.Laws 1343.

Accordingly, and contrary to the majority's assertion, in 1973, when the legislature authorized

The majority further asserts that the CWCB may not take less than its full decree without water court adjudication because under this statute the CWCB is "imbued with unique statutory responsibilities." *id.* at 1259, and "has a unique statutory fiduciary duty to protect the public in the administration of its water rights decreed to preserve the natural environment," *id.* at 1260. I disagree.

AWW has not argued that the CWCB has a "fiduciary duty" to protect the public and the majority does not provide any authority supporting its conclusion that section 37–92–102(3) imposes such a duty. Maj. op. at 1259–60. AWW asserts that section 37–92–102(3) imposes a "public trust" on CWCB by granting CWCB authority to hold instream flow rights "on behalf of the public." This court has never recognized the public trust doctrine with respect to water. Furthermore, whatever the nature of the fiduciary duty recognized by the majority in this case, I do not understand the majority to mean that a breach of this fiduciary duty would support a public claim for damages.

Nevertheless, to the extent that the majority uses "fiduciary duty" as analogous to a public trust responsibility, that duty is fulfilled as long as the CWCB has acted within its authority under section 37–92–102(3). *See Black's Law Dictionary* 563 (5th ed. 1979) (defining "fiduciary" as analogous to a trust" or as "a person or institution who manages money or property for another and who must exercise a standard of care in such management activity imposed by law or contract"). The term "public trust doctrine" refers to a common law concept that imposes on the government the duty "to preserve and protect the public lands for the public's common heritage." *See Sierra Club v. Block,* 622 F.Supp. 842, 866 (D.Colo.1985) (acknowledging the existence of the public trust doctrine applicable to federal lands, but rejecting Sierra Club's claim based on the doc-

trine). The term also has been used to designate the public's right of use and access to navigable waterways. *See People v. Emmert,* 198 Colo. 137, 141, 597 P.2d 1025, 1027 (1979) (rejecting the public trust as a basis for assuring public recreational use of water overlying privately owned stream beds of non-navigable waterways).

In any event, the concept of a public trust has no independent content. As the Supreme Court said, "it is not for the courts to say how that trust shall be administered." *Light v. United States,* 220 U.S. 523, 537, 31 S.Ct. 485, 488, 55 L.Ed. 570 (1911). Where the legislature has provided statutory directives for the management and protection of public resources, "those statutory duties 'comprise *all* the responsibilities which defendants must faithfully discharge.'" *Sierra Club,* 622 F.Supp. at 866 (citing *Sierra Club v. Andrus,* 487 F.Supp. 443, 449 (D.D.C. 1980)) (emphasis in original); *Light,* 220 U.S. at 537, 31 S.Ct. at 488.

In this case, section 37–92–102(3) gives the CWCB authority to appropriate water for minimum stream flows "on behalf of the people." However, to the extent this provision imposes a "public trust" responsibility on the CWCB similar to that of the federal government over public lands, it also provides statutory directives for the management and protection of instream flows for the protection of the natural environment. Therefore, as long as the CWCB has acted within its authority under this provision, it has satisfied whatever public trust responsibilities it may have.

Section 37–92–102(3) gives the CWCB discretion to determine whether, and in what amount, to appropriate water to assure minimum stream flows. It provides in relevant part:

> [T]he Colorado water conservation board *is hereby vested with the exclusive authority,* on behalf of the people of the state of

CWCB to appropriate water for minimum stream flows and included minimum stream flows in the definition of beneficial use, it did not *limit* the authority of the CWCB. *See* Ch. 442, sec. 2, § 148–21–2, 1973 Colo.Sess.Laws 1521–22. Prior to 1973, the CWCB had been subject to the

same definition of "beneficial use" as all other appropriators. In giving CWCB authority to appropriate water for the preservation of the natural environment, the legislature thus *expanded* the authority of CWCB.

Colorado, *to appropriate* in a manner consistent with sections 5 and 6 of Article XVI of the state constitution, *such waters of natural streams and lakes as the board determines may be required for minimum stream flows* ... to preserve the natural environment to a reasonable degree.

§ 37–92–102(3), 15 C.R.S. (1990) (emphasis added). Furthermore,

[i]n the adjudication of water rights pursuant to this article and other applicable law, *no other person or entity shall be granted a decree adjudicating a right to water or interests in water for instream flows in a stream channel between specific points or for natural surface water levels* or volumes for natural lakes, for any purpose whatsoever.

*Id.* (emphasis added). The statute also requires that:

Before initiating a water rights filing, the board shall determine that the natural environment will be preserved to a reasonable degree by the water available for the appropriation to be made; that there is a natural environment that can be preserved to a reasonable degree with the board's water right, if granted; and that such environment can exist without material injury to water rights.

§ 37–92–102(3)(c).

Thus, the statute gives the CWCB alone the authority to hold instream flow rights. It also requires the CWCB to make certain administrative findings before filing an application for decreed water rights.

Significantly, however, the statute does not require that the CWCB appropriate water for instream flows, but merely is a grant of authority to do so. In addition, the amount to be appropriated by the CWCB under the statute is *"as the board determines* may be required ... to preserve the natural environment to a reasonable degree." *Id.* (emphasis added). We considered this delegation of legislative authority to the CWCB and upheld it as constitutional in *Colorado River Water Conservation Dist. v. Colorado Water Conservation Bd.,* 197 Colo. 469, 478–80, 594 P.2d 570, 575–77 (1979). The statute thus clearly delegates authority to determine in what circumstances, and in what amount, to appropriate water for minimum stream flows to the CWCB. In the face of such a clear delegation, I would hesitate to limit by implication the discretion granted to the CWCB to determine minimum stream flows.

While the statute gives discretion to the CWCB to appropriate water for instream flows, the statute indicates that CWCB's instream flow rights are to be administered within the existing prior appropriation system. The statute specifies that:

Any such appropriation shall be subject to the present uses or exchanges of water being made by other water users pursuant to appropriation or practices in existence on the date of such appropriation, whether or not previously confirmed by court order or decree.

§ 37–92–102(3)(b). The statute also clearly contemplates that the CWCB is subject to the same procedural requirements under the state's water rights administration system that apply to any other water rights holder. As the statute further specifies:

The board may *initiate such applications* as it determines are necessary or desirable for utilizing water, water rights, or interests in water appropriated, acquired, or held by the board, *including applications for changes of water rights, exchanges, or augmentation plans.*

§ 37–92–102(3) (emphasis added). Applications must be submitted by rights holders and prospective rights holders to obtain "determinations of water rights" under section 37–92–302. Accordingly, aside from establishing the CWCB's unique ability to hold instream flow rights, the statute anticipates that CWCB's instream flow rights will be acquired and administered in the same manner as any other water right.

Under Colorado's system of prior appropriation, adjudication by the water court is unnecessary to authorize a water rights hold-

er to utilize less than the full decreed appropriation. Decreed water rights are frequently not exercised to the full extent of the decree. *Matter of Bd. of County Comm'rs,* 891 P.2d 952, 958 (Colo.1995). In fact, "[w]e have long recognized that there is read into every decree awarding priorities the implied limitation that diversions are limited to those sufficient for the purposes for which the appropriation was made, regardless of the fact that such limitation may be less than the decreed rate of diversion." *Weibert v. Rothe Bros., Inc.,* 200 Colo. 310, 318, 618 P.2d 1367, 1372 (1980); *see also Rominiecki v. McIntyre Livestock Corp.,* 633 P.2d 1064, 1067 (Colo.1981). Because a decreed instream flow right is subject to an implied limitation to the minimum stream flow required to preserve the natural environment, the CWCB's correction of its calculation of the minimum stream flow and its decision to enforce no more than that amount is fully consistent with the water court's decree.

I recognize that, as part of its consideration of an application for recognition of a water right, the water judge

> shall make such investigations as are necessary to determine whether or not the statements in the application and statements of opposition are true and to become fully advised with respect to the subject matter of the applications and statements of opposition.

§ 37–92–302(4). Nevertheless, a water decree confirms only that the "steps have been completed to effect an appropriation." *Weibert,* 618 P.2d at 1372. It does not represent a finding on the amount of water sufficient for the purposes of the diversion. *See Weibert,* 618 P.2d at 1372 (decree not res judicata on the issue of historical use of water); *Pulaski Irrigating Ditch Co. v. City of Trinidad,* 70 Colo. 565, 568, 203 P. 681, 682 (1922) (although city diverted decreed amount, city could not sell water remaining after sewage treatment). Thus, while the water court's decree states that the CWCB's "statements in the application are true" and reiterates the purpose of the application and the amount of water appropriated, these findings do not represent an independent determination or even a review of the finding by the CWCB of the minimum stream flow necessary to preserve the natural environment to a reasonable degree. Contrary to the majority's assertion, then, the CWCB did not "unilaterally modify" a lawful decree of the water court in deciding to enforce less than the full decreed instream flow right. *See* maj. op. at 1259.

Even if the CWCB's decision not to enforce its full instream flow right were inconsistent with the water court's decree in this case, there is no indication that the legislature intended for the water court to have supervisory jurisdiction over the CWCB's administration of instream flow rights.[3] The water court is neither required nor autho-

3. The majority cites § 37–92–102(3)(c.5) as indicating "the General Assembly's intent that the Board must proceed through the water court to change a decreed conditional water right." Maj. op. at 1260 n. 16. Although I first note that the cited section has no application to the case before us because the section applies only to CWCB's acquisition of conditional water rights in the Yampa river basin, § 37–92–102(3)(c.5)(I), I agree with the majority's general point.

A conditional water right is "a right to perfect a water right with a certain priority upon the completion with reasonable diligence of the appropriation upon which such water right is to be based." § 37–92–103(6). It follows that the CWCB cannot obtain a conditional instream flow water right by initial appropriation because no diversion of water is necessary to complete the appropriation of instream flows. CWCB can only obtain such a right from another rightsholder by some form of contractual agreement.

*See* § 37–92–102(3); § 37–92–102(3)(c.5)(III) (CWCB must demonstrate that the acquisition of conditional water rights will provide benefits that would not be available through initial appropriation by the CWCB). Since the CWCB is the only entity authorized to hold water rights for instream flows, applying conditional rights to maintain instream flows necessarily involves a "change of water right" because it changes the use of the water. *See* § 37–92–103(5). Application to the water court is required for a "change of water right" under § 37–92–302(1)(a).

However, as this discussion illustrates, both a "change in water right" and a "conditional water right" are terms of art under the statute, and neither is involved in this case. § 37–92–102(3)(c.5) does not support the proposition that "modifications of an appropriation" such as the one at issue here, are within the jurisdiction of the water court, as the majority holds. Maj. op. at 1260; *see id.* at 1257–58 n. 11.

rized by statute to make a determination of the minimum stream flow reasonably necessary to preserve the natural environment. Section 37–90–102(3) authorizes appropriation of "such waters ... as the *board determines* may be required for minimum stream flows," not such waters as the water court determines may be required. (emphasis added). Nor does the water court have jurisdiction to review the CWCB's determination of minimum stream flows. Section 37–92–203 gives the water judge

> exclusive jurisdiction of water matters within the division, and no judge other than the one designated as a water judge shall act with respect to water matters in that division. *Water matters shall include only those matters which this article and any other law shall specify to be heard by the water judge of the district courts.*

§ 37–92–203(1) (emphasis added). Determination of "minimum stream flows ... to preserve the natural environment to a reasonable degree," is not a matter specified by statute to be heard by the water judge and thus does not qualify as a "water matter" under the statute.

Likewise, the decision to enforce less than the decreed amount for minimum stream flow is not within the definition of any "water matters" over which the water judge has jurisdiction pursuant to article 92. The water judge has jurisdiction over applications for "determinations of water rights" under section 37–92–302. These include:

> a determination of a water right or a conditional water right and the amount and priority thereof, including a determination that a conditional water right has become a water right by reason of the completion of

the appropriation, a determination with respect to a change in water right, approval of a plan for augmentation, finding of reasonable diligence, approval of a proposed or existing exchange of water ..., or approval to use water outside the state ...

The water judge also must review the state engineer's abandonment lists pursuant to section 37–92–401 and abandonment claims filed in opposition to applications for water rights. *See Gardner v. State*, 200 Colo. 221, 228, 614 P.2d 357, 361 (1980); § 37–92–401(6).

Of these "water matters," none encompasses the CWCB's determination that less than the decreed amount was necessary for minimum stream flow in this case. The decision to use less than the full amount of a water right is not an "appropriation" [4] because it is not an application of water to a beneficial use, but is only a determination not to apply water to an already-decreed use. It is not a "change in water right" [5] because a change in water right does not involve a change in quantity but a change in use of the water right. Nor is the CWCB's decision an "abandonment" under the water judge's jurisdiction because the water judge only need hold a hearing on an abandonment claim when asserted in opposition to a water rights determination or during a hearing once every ten years on the water engineer's decennial abandonment list. *See Gardner*, 200 Colo. at 229, 614 P.2d at 362; § 37–92–401(6).

Finally, as a policy matter, even if the CWCB could be required to apply for adjudication of a reduced decree amount, documenting the relinquishment of part of the decreed amount of an instream flow right through an adjudication in the water court would not assure that CWCB appropriations

---

**4.** "Appropriation" means "the application of a specified portion of the waters of the state to a beneficial use pursuant to the procedures prescribed by law...." § 37–92–103(3)(a).

**5.** "Change in water right" means "a change in the type, place, or time of use, a change in the point of diversion, a change from alternate or supplemental points of diversion to a fixed point of diversion, a change in the means of diversion, a change in the place of storage, a change from direct application to storage and subsequent application, a change from storage and subsequent application to direct application, a change from a fixed place of storage to alternate places of storage, a change from alternate fixed place of storage to alternate places of storage, a change from alternate places of storage to a fixed place of storage, or any combination of such changes...." § 37–92–103(5).

are "consistent with other appropriations" by providing would-be appropriators with notice of water availability.[6] Availability of water for future appropriation is not based on the assumption that all absolute rights are exercised to their fullest extent, *Matter of Bd. of County Comm'rs*, 891 P.2d at 958, but on documented historical use, *id.* at 962. Without imposing similar requirements on all water rights holders, adjudication of instream flow right reductions would do little to ease the burden on future appropriators to prove water availability.

Furthermore, as part of the state water engineer's and the division engineer's duty to administer the waters of the state, they must prepare abandonment lists to determine and document water availability. *See* § 37–92–401. Under CWCB's rules and regulations adopted in 1993, the CWCB gives written notice to the division engineer of its decision to seek enforcement of a lesser amount than set forth in the decree. Rule 10.40, 2 CCR 408–2 (1993). Accordingly, an additional hearing and decree to authorize the CWCB's decision not to seek enforcement of its full decreed right does little to improve the efficiency of the system or to provide notice to other water users of the availability of additional water.

For the foregoing reasons, I would decline to impose implied requirements on the CWCB that would alter the degree of discretion legislatively allocated to the CWCB to determine in what circumstances, and in what amount, it should acquire and exercise instream flow rights to preserve the natural environment. I would hold that the CWCB need not seek modification of an instream flow decree in water court before deciding not to seek enforcement of its full decreed right and that CWCB is authorized by section 37–92–102(3) to enforce less than its full decreed amount for minimum stream flows.

## II.

Because I would find that the CWCB's decision to enforce less than the decreed

instream flow in Snowmass Creek was not in excess of its statutory authority, I must reach the second issue on which we accepted certiorari and determine whether the CWCB's decision was supported by substantial evidence in the record. AWW argues that the CWCB's modified determination of minimum stream flows was not supported by substantial evidence. I disagree.

> Substantial evidence ... "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," ... and must be enough to justify, if the trial were before a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury.

*Colorado Municipal League v. Mountain States Telephone*, 759 P.2d 40, 44 (Colo.1988). Therefore, where evidence is conflicting, the reviewing court may not substitute its judgment for that of the fact finder. *Board of County Comm'rs v. Simmons*, 177 Colo. 347, 350, 494 P.2d 85, 87 (1972); *Glasmann v. Department of Revenue*, 719 P.2d 1096, 1097 (Colo.App.1986).

While the evidence in this case is conflicting, under the APA standard of review, I would affirm the agency decision as supported by substantial evidence. AWW pointed to weaknesses in the analysis supporting the agency's decision and presented independent expert witness testimony indicating that more study is necessary before relinquishing winter flow rights. However, experts from the State Department of Wildlife, the County, and Aspen Skiing Company independently confirmed that between five and seven cubic feet per second, rather than twelve cubic feet per second, would provide sufficient winter flow to preserve the natural environment. They also rebutted both AWW's contention that the calculation error precipitating CWCB's reconsideration of minimum stream flows along the stretch of Snowmass Creek in question did not affect the initial stream flow calculation; and

---

**6.** Prior appropriators would be unaffected by the CWCB's instream flow rights because their rights are of higher priority and can be enforced

against the CWCB. *See City of Colorado Springs v. Bender*, 148 Colo. 458, 463–64, 366 P.2d 552, 555–56 (1961).

AWW's contention that winter flow predictions from the County's expert were "outside the range of accuracy." I find that this expert testimony and supporting data constitute substantial evidence supporting the CWCB's decision to enforce less than its decreed minimum stream flow rights in this case.

In conclusion, I would hold that (1) the CWCB acted within its statutory authority in determining that it will enforce less than its decreed instream flow right as the minimum stream flow necessary to preserve the natural environment to a reasonable extent, and (2) this decision was supported by substantial evidence in the record. Accordingly, I would affirm the judgment of the district court.

VOLLACK, C.J., joins in this dissent.